875 A.2d 188

**SMELKINSON SYSCO**

v.

**James E. HARRELL.**

**No. 2644, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

June 2, 2005.

438

**440**

David A. Skomba, Baltimore, for appellant.

Charles Jerome Ware, Columbia, for appellee.

Panel: SALMON, KRAUSER and RAYMOND G. THIEME, JR. (Ret'd, Specially Assigned), JJ.

RAYMOND G. THIEME, JR., Judge, Retired, Specially Assigned.

Appellant Smelkinson SYSCO, Inc. (SYSCO),[1] asks us to enforce the stipulated damages provision of a Settlement Agreement and General Release that the company entered into with former employee James E. Harrell, appellee. The parties agreed, *inter alia*, that, if Harrell breached the agreement, SYSCO's damages would include the $185,000 the company paid to settle pending and future disputes with Harrell. Challenging the trial court's ruling that this clause is an unenforceable penalty for Harrell's breach of that agreement, SYSCO raises two issues for our review, which we rephrase as follows:

I. Did the trial court err in refusing to enforce the stipulated damages provision in the Settlement Agreement?

II. Did the trial court err in refusing to let the jury decide what SYSCO's actual damages were?

---

1. Smelkinson SYSCO is a subsidiary of SYSCO Corporation and also operates as Sysco Food Services of Baltimore, Inc. We refer to all affiliates here as SYSCO.

We hold that, although the clause in question is not a liquidated damages provision, it is a reasonable and enforceable stipulated damages remedy. Accordingly, we shall vacate the $1.00 award by the Circuit Court for Howard County and remand for entry of a damage award consistent with the Settlement Agreement.

## FACTS AND LEGAL PROCEEDINGS

Harrell, a SYSCO truck driver for 13 years, filed race discrimination, labor complaints, and workers' compensation claims against the company. After consulting with counsel, Harrell and SYSCO settled those claims in a confidential "global" settlement covering all pending and potential claims involving Harrell and SYSCO.[2] The parties executed a Settlement Agreement and General Release (the Settlement Agreement) dated July 2, 2001, and submitted it to the Workers' Compensation Commission for approval. The terms of that agreement became effective upon the Commission's August 31, 2001 approval of it as an "Agreement of Final Compromise and Settlement."

Under the Settlement Agreement, Harrell resigned his employment and promised never to seek re-employment with

---

2. At the time they executed the Settlement, the following litigation was pending between SYSCO and Harrell:

- In 2000, Harrell filed race discrimination charges with the Equal Employment Opportunity Commission (EEOC), and then in the United States District Court for the District of Maryland, Case Nos. L–00–CV–2098, L–00–CV–3225.
- On September 14, 2000 Harrell filed a complaint on behalf of himself and similarly situated employees against whom he alleges SYSCO discriminated on the basis of their participation in activities protected under the Surface Transportation Assistance Act, 49 U.S.C. § 31105, which provides that employers may not discipline, discharge, or discriminate against employees who lodge or aid safety complaints or who refuse to operate a vehicle they reasonably consider to be unsafe.
- Harrell had claims pending before the Workers' Compensation Commission, alleging accidental injuries that occurred on 8/3/92, 8/10/92, 12/1/92, 6/4/97, 6/30/99, and 8/30/00.

According to SYSCO, previous claims made by Harrell against the company were resolved in favor of SYSCO.

SYSCO. In addition, he covenanted that he would not "disparage" SYSCO and that he would "neither voluntarily aid nor voluntarily assist in any way third party claims made or pursued against the Company." SYSCO, in turn, agreed not to challenge Harrell's unemployment compensation appeal and to pay Harrell a total of $185,000.[3]

At issue in this appeal is the parties' agreement regarding damages. With independent counsel advising him, Harrell agreed to the following stipulated damages provision in Paragraph 7 of the Settlement Agreement:

> Mr. Harrell agrees not to disparage the Company and the Company agrees not to disparage Mr. Harrell.... It is expressly understood that this paragraph is a **substantial and material provision** of the Agreement and **a breach of this paragraph will support a cause of action** for breach of contract and will entitle the aggrieved parties **to recover damages flowing from such breach specifically, including, but not limited to, the recovery of any payments made pursuant to paragraph numbers 1 and 2 above as well as payments made pursuant to the Agreement of Final Compromise and Settlement pending before the Maryland Workers' Compensation Commission.** It is expressly agreed that **the non-exclusive damages set forth in this paragraph in the event of a breach are not a penalty but are fair and reasonable in light of the difficulty of proving prejudice to the Company in the event of such a breach. ...**

(Emphasis added.)

Shortly after executing the Settlement Agreement and accepting full payment under it, Harrell breached his promises not to disparage SYSCO and not to assist third-party claimants. In a letter dated December 11, 2001, Harrell wrote to Mike Cutchember, a SYSCO shop steward, on behalf of John

---

**3.** Of that payment, $149,999 was allocated to the workers' compensation claims and the remaining $35,001 was allocated to Harrell's federal labor and discrimination claims.

Womack, a SYSCO employee with whom Harrell worked. In its entirety, the letter states:

John Womack called me on 12/14/01, about a problem with [J.B.] a white female supervisor at Sysco. He had said to me weeks before I left Sysco: she tried to get him fired, by blaming him for an accident, that happened two months earlier by someone else. We've talked off and on and he often said, that she has been harassing him at work. John Womack is one of the drivers I daily talked with for years while working at Sysco. I would make several drivers know what was going on in my affairs for my protection, and witness. I had also told him about [J.B.] hugging me and I didn't know if it was a plan they had against me.

[J.B.] hugged me twice while in the warehouse at the docks; after she and [A.A.] came to a stop trying to get something on me. I told [P.M.] a shopsteward about [J.B.] hugging me; he said, that is sexual harassment. And I should file a complaint on her about that, but I didn't. This was a time when Sysco was doing everything they could to frame me for anything so they could fire me; but [there] was no legal reason, but the charges I filed against them concerning racial discrimination.

A District Sales Manager rode with me on a route one day, and he was harassing the customers about me, and asking them "do I do my work". He also watched everything I did, how fast I drove, and came into the back room when I was talking to a customer and wrote notes as we talked. One salesperson tried to get a customer to write a bad letter against me to get me fired, but they refused. Three of the employees at that stop told me about this, this is the same place where [J.B.] and [A.A.] came harassing me and the customer for over an hour. If I can be of any more help let me know.

The next day, on December 12, 2002, Womack initiated race discrimination charges against SYSCO at the Maryland Commission on Human Relations. Like Harrell, Womack complained that he was the victim of racial discrimination by J.B., a white female safety supervisor.

In support of Womack's claim, Cutchember gave SYSCO a copy of Harrell's letter. SYSCO then filed suit against Harrell for breach of contract and specific performance. In its January 31, 2002 complaint, SYSCO alleged that Harrell violated his covenants not to disparage the company and not to aid third parties in their grievances against the company. Following discovery, SYSCO moved for summary judgment, arguing that it was entitled to recover as liquidated damages the $185,000 it paid to settle Harrell's claims. Harrell filed a cross-motion for summary judgment, arguing that the damage remedy in Paragraph 7 was an unenforceable penalty.

The Circuit Court for Howard County held that there was no dispute that Harrell breached his obligations under Paragraphs 7 and 16 of the Settlement Agreement. "[U]nder any definition of the word 'disparage[,]' the letter repeatedly disparaged [SYSCO] in regard to some of the same matters that were at the core of [Harrell's] prior disputes with [SYSCO]." In addition, the court found, Harrell "was aiding and assisting third-party claims against [SYSCO.]" Harrell was ordered to "specifically perform each and every obligation imposed upon him by the [Settlement Agreement] from this date forward unless and until otherwise released from such obligation(s) by this Court."

The court nonetheless concluded that SYSCO's "damages raise other issues." It held that the stipulated damages applied only to the "disparagement" breach under Paragraph 7, so that actual damages arising from the breach of Paragraph 16 would have to be proven. The court then ordered briefing on the issue of whether the stipulated damage remedy in Paragraph 7 is a valid liquidated damages clause or an unenforceable penalty.

After reviewing the "test for the validity of a liquidated damages clause," the court resolved that issue in Harrell's favor. The court "ha[d] no doubt that the parties intended this paragraph to operate as a liquidated damage provision." Given "the express language of Paragraph 7," however, it held that $185,000 in liquidated damages "smacks directly of a

penalty for breaching the agreement." The court noted the "long history of trouble between [SYSCO] and Mr. Harrell" and that SYSCO "was clearly seeking an end to it fully and finally." But the court ultimately found it "hard to see how a simple disparagement ... could in any reasonable way be equated to a damage amount of $185,000." In the court's view, "[t]he trouble" with that figure is that

> **there is simply no reasonable connection between the anticipated damage and the amount selected.** It is the whole amount of the settlement which seems to be based primarily on the value and weight attributed to the various Workers['] Compensation cases being settled.

(Emphasis added.)

The court refused to enforce the provision. The parties proceeded to trial on the question of whether SYSCO sustained any actual damages. SYSCO was not permitted to "argue as a basis for [actual] damages the liquidated damage amount" of $185,000, given the court's determination "that that's invalid."

After taking testimony and evidence regarding SYSCO's damages, the trial court refused to submit the case to the jury. Instead, it granted Harrell's motion for judgment on the ground that SYSCO failed to present sufficient evidence to support anything but a nominal damage award. Judgment was entered in favor of SYSCO in the amount of $1.00 plus costs. After the court denied its motion to alter or amend the judgment, or for a new trial, SYSCO noted this timely appeal.

## DISCUSSION

### I.

### Stipulated Damages

SYSCO challenges the trial court's decision not to enforce the parties' agreement that SYSCO could recover the $185,000 it paid to Harrell if Harrell breached his non-disparagement covenant. We find merit in SYSCO's challenge, even though,

for the reasons set forth below, we do not view the clause in question as a liquidated damages agreement.

## A.

### Liquidated Damages[4]

The term "liquidated damages" means a "specific sum of money . . . expressly stipulated by the parties to a . . . contract as the amount of damages to be recovered by either party for a breach of the agreement by the other." *Traylor v. Grafton*, 273 Md. 649, 661, 332 A.2d 651 (1975). As a general rule, "a liquidated damage clause is within the substantive law of contracts, and—if not a 'penalty'—is an enforceable provision as a sum agreed upon by the parties to be paid in the event of a breach, enforceable as any other provision or valid promise in the contract." *Id.*

The principle of freedom of contract dictates that express contract clauses are presumed to be enforceable. Parties are held to the express terms of their contract. The burden of proving that a particular damage stipulation is not enforceable is "on the party seeking to invalidate" it. *See Mattvidi Assocs. Ltd. P'ship v. NationsBank of Va.*, 100 Md.App. 71, 92, 639 A.2d 228, *cert. denied*, 336 Md. 277, 647 A.2d 1216 (1994). Maryland courts generally consider the

---

4. The Law of Liquidate Damages is one of the most ancient concepts in the law. For example, one of the relics of Hammurabi's reign (1795–1750 BC) is the code, which provides: "If a man has knocked out the eye of a patrician, his eye shall be knocked out." Jewish law provided some interesting remedies with societal as well as private law consequences. *Exodus* 22:1 provides: "If a man shall steal an ox, or a sheep, and kill it, or sell it; he shall restore five oxen for an ox, and four sheep for a sheep."

After quite literally centuries of veneration of these concepts, like the camel's nose under the tent, once the concept of "penalty" crept into this area, the law of liquidated damages became *sui generis* within the law of contracts by overtly insulting the freedom of parties to structure their own agreement which is universally acknowledged to be at the heart of the law of contracts. Why should such clauses be treated differently than other contract provisions that may be equally unfair or one-sided?

following three factors as the defining characteristics of an enforceable liquidated damages clause:

 (1) clear and unambiguous language providing for "a certain sum";

 (2) stipulated damages that represent reasonable compensation for the damages anticipated from the breach, measured prospectively at the time of the contract rather than in hindsight at the time of the breach; and

 (3) a "mandatory binding agreement[ ] before the fact which may not be altered to correspond to actual damages determined after the fact."

*See Holloway v. Faw, Casson & Co.*, 319 Md. 324, 354, 572 A.2d 510 (1990); *Traylor*, 273 Md. at 668, 332 A.2d 651.

■ Determining whether a particular clause in a contract satisfies these criteria "ordinarily is a question of law for the court." *Traylor*, 273 Md. at 667, 332 A.2d 651. Using the same record and deferring to the trial court's resolution of credibility issues and factual disputes, we reach our own independent conclusion regarding that question of law. *See id.* at 667–68, 332 A.2d 651; *Energy Plus Consulting, LLC v. Illinois Fuel Co., LLC*, 371 F.3d 907, 909 (7th Cir.2004).

Based on the language in the Settlement Agreement and the circumstances in which it was executed, the trial court found that Harrell and SYSCO intended to create an enforceable liquidated damages clause. The court concluded, however, that the clause does not satisfy the second requirement that it be reasonable compensation for expected damages. Specifically, the court ruled that Paragraph 7 operates as a penalty because there is "no reasonable connection between the anticipated damage and the amount selected."

■ By including an agreed damages provision in the contract, contracting parties reduce the cost of contract breakdown by eliminating the expense of calculating damages and by reducing the likelihood of litigation. Either or both parties to a contract, therefore, commonly enjoy the right to terminate at some cost. "Treating settlement agreements . . . as

any other binding contract 'is consistent with the public policy dictating that courts should look with favor upon the compromise or settlement of law suits in the interest of efficiency and economical administration of justice and the lessening of friction and acrimony.' " *Long v. State,* 371 Md. 72, 84–85, 807 A.2d 1 (2002) (citation omitted). Thus, as we do when examining the construction of any contract, we begin by examining the language in Paragraph 7 of the Settlement Agreement. *See, e.g., Langston v. Langston,* 366 Md. 490, 506, 784 A.2d 1086 (2001) (interpretation of settlement agreement "begins with the plain meaning of the contractual terms").

 The trial court, Harrell, and SYSCO premised their debate over the enforcement of Paragraph 7 on the conclusion that this is a liquidated damages provision. As a threshold matter, we point out that this characterization is not dictated by the parties' use of the label "liquidated damages." Although courts certainly consider "[t]he nomenclature used by the parties," we are not bound by it when other language and circumstances support a different conclusion. *See Traylor,* 273 Md. at 661, 332 A.2d 651. For example, the parties' description of their damage agreement as liquidated damages "is not determinative in passing upon whether or not the payment of the designated sum is in fact a penalty." *Id.* Instead, "the decisive element is the intention of the parties," which "is to be gleaned from the subject matter, the language of the contract and the circumstances surrounding its execution[,]" taken as a whole. *Id.* We follow the same approach in determining whether a stipulated damages remedy is a liquidated damages clause.

 Although the trial court focused on the second feature of a valid liquidated damage agreement, we shall set aside, for the moment, the question of whether the amount of stipulated damages in Paragraph 7 is reasonable. This is because we conclude that the agreement lacks both the first and third characteristics of a liquidated damages clause, in that it does not clearly identify a "certain sum" and does not create a "binding agreement before the fact that may not be altered to

correspond to actual damages." *See Holloway,* 319 Md. at 354, 572 A.2d 510. By agreeing that the non-breaching party is "entitle[d] ... to recover **damages flowing from** such breach" (emphasis added), Harrell and SYSCO selected the same type of *post hoc* yardstick that traditionally has been used to measure actual or "unliquidated" damages. *See, e.g., Abbott v. Gatch,* 13 Md. 314, 333 (1859) ("unliquidated damages" include "such damages as are incidental to and caused by the breach, and may be said to flow reasonably and naturally from such breach, and are not accidental or contingent losses"). Instead of agreeing to either a pre-determined amount of damages, or to a formula for damage, in the event of a breach, the parties more broadly agreed that the recoverable damages "flowing from such breach" would include the settlement payments. Significantly, they also agreed that SYSCO's damages would not be "not limited to" that amount if the company also could show other actual damages from Harrell's breach. The parties' understanding that this agreement was not a mandatory and binding stipulation fixing the amount of damages at the $185,000 paid to Harrell is underscored by their explicit agreement that the stipulated "damages set forth in this paragraph in the event of a breach" are **"non-exclusive."** (Emphasis added.) Because Paragraph 7 does not contain a pre-determined "ceiling" on the amount of "damages flowing from" Harrell's breach of the non-disparagement covenant, we conclude that it is an unliquidated damage stipulation rather than a liquidated damages clause. *See, e.g., Traylor,* 273 Md. at 662, 332 A.2d 651 (nature of stipulated damages "remove[d] it from the ambit of liquidated damages").

Even though Paragraph 7 is not enforceable as liquidated damages, we recognize that this term represents the parties' arm's-length agreement that SYSCO would not be required to prove that Harrell's breach of his non-disparagement covenant damaged SYSCO, and that the amount of that damage would be at least the amount it paid to "buy peace" with Harrell. As with any other term of a negotiated settlement agreement, the burden of proving that these stipulations are unenforceable is

on the party challenging their validity. *See, e.g., Creamer v. Helferstay,* 294 Md. 107, 121, 448 A.2d 332 (1982) ("absent intentional, culpable conduct such as fraud, duress, or undue influence, a unilateral mistake is not ordinarily a ground for relief from a [settlement] contract"); *see generally* 3 Dan B. Dobbs, *The Law of Remedies* § 12.9(2), at 253 (2d ed. 1993) ("A rule that puts the burden on the plaintiff to justify the liquidated damages is a rule that may deprive the plaintiff of his bargain").

## B.

### Enforcement Of Paragraph 7 Damages

It is debatable whether a stipulated damages clause such as the one before us is subject to the "reasonableness" or "penalty" standard that applies to a liquidated damages clause,[5] or, instead, whether it is measured against a more deferent standard, such as unconscionability, that applies to other contractual terms.[6] That question need not be answered to resolve this appeal, however. Assuming *arguendo* that this provision may not be enforced unless it is reasonable, we nevertheless conclude that it satisfies that test.

---

5. When parties are sophisticated and externalities are absent, courts do not review the parties' contractual choices for reasonableness. The liquidated damage rules, however, require courts to review the parties' choice of a damage measure for reasonableness.

6. Generally, a party attacking the validity of other terms in an arm's-length settlement agreement or other contract bears the burden of proving fraud, duress, coercion, mistake, undue influence, or incompetence. *See Cannon v. Cannon,* 384 Md. 537, 555, 865 A.2d 563, 573 (2005). There has been insightful academic debate regarding the use of the "reasonableness" or "penalty" standard to measure the validity of a negotiated liquidated damages clause, on the ground that it authorizes a questionable and exuberant level of judicial devouring of the parties' agreement. *See, e.g.,* 3 Dan B. Dobbs, *The Law of Remedies* § 12.9(1) *et seq.* (2d ed.1993) (in contrast to the "fraud, mistake, unconscionability or similar" standard for invalidating other terms in a contract, "[w]hen it comes to the parties' agreement for remedies, ... courts have been more intrusive and less willing to respect the parties' agreement").

Determining whether a stipulated remedy is unreasonable "can be hard for the same reason the parties [find] it hard to calculate actual damages in the first place: what's the benchmark against which the stipulated damages will be compared to determine whether they are" reasonable? *Scavenger Sale Investors v. Bryant*, 288 F.3d 309, 311 (7th Cir.2002). Moreover, as Judge Easterbrook observed in upholding the damages clause of a settlement agreement, "[e]verything depends on which end of the telescope one looks through." *Id.*

Here, the language and circumstances surrounding the Settlement Agreement conclusively establish that both Harrell and SYSCO considered this stipulated damage remedy to be reasonable. They reasonably conceded that SYSCO would suffer harm to its reputation and/or additional labor and litigation expenses if Harrell continued to disparage the company for allegedly creating a hostile work environment in which long-term African–American union employees such as his co-worker Womack and himself were harassed, unfairly disciplined, not compensated for injuries, and retaliated against.[7] In addition, Harrell reasonably acknowledged the difficulty SYSCO would have in proving a specific dollar figure for the "prejudice" "flowing from" his breach of the non-disparagement covenant.[8] Thus, the record shows that Harrell understood that this settlement rested squarely on his assurances to SYSCO that this proof problem would not leave SYSCO out-of-pocket $185,000 with only a toothless remedy in the event he continued to disparage the company.

---

7. Indeed, that is precisely what the trial court concluded Harrell did in his letter; that finding has not been appealed.

 Moreover, we are not persuaded by Harrell's suggestion that his breach of the Settlement Agreement was not material, in light of the explicit language to the contrary in Paragraph 7, the circumstances in which Harrell signed the Agreement and received the settlement money, and the *prima facie* link between Harrell's disparaging letter and the discrimination claim asserted by Womack.

8. Ultimately, it was this difficulty that led the trial court to rule that SYSCO had not met its burden of proving actual damages.

What SYSCO bought through the negotiated settlement, then, was immediate and long-term "peace" with Harrell, with the attendant right to expect that it would no longer have to expend money, effort, or goodwill in responding to his disparaging allegations. Indeed, the language in Paragraph 7 and the circumstances surrounding the execution of the Settlement Agreement leave no doubt that SYSCO and Harrell struck a bargain that was designed to prevent precisely what happened here-that SYSCO would pay Harrell $185,000 to drop all his allegations, claims, and agitations against the company, only to have Harrell later resume them. Without Harrell's assurance that he would not do so, SYSCO would not have agreed to pay Harrell $185,000 to settle his claims. Thus, Harrell's agreement that it is "fair and reasonable" for the "damages flowing from such breach" to include that settlement money was a negotiated cornerstone of this Settlement Agreement.

In this respect, Paragraph 7 fairly may be viewed as both a disincentive to Harrell **and** an assurance of performance to SYSCO. To the extent that it might arguably be characterized as exacting a "penalty for breach," we see nothing unreasonable about such a clearly understood and expressed *quid pro quo.* To the contrary, there are important reasons to enforce this remedy.

Courts have long been reluctant to nullify a negotiated remedy at the heart of a settlement agreement.

The law always favors compromises and amicable adjustments of disputes, rather than compel parties to resort to litigation and it would be strange if, in the absence of clear evidence of fraud or mistake, the parties were not bound and concluded after what has taken place in respect to this award.

*Sisson v. Baltimore,* 51 Md. 83, 95–96 (1879). Accordingly, [it]t is well established in Maryland that a valid settlement agreement between the parties is binding upon them. As early as 1855, [the Court of Appeals] ... made it clear that settlement agreements are desirable and should be binding and enforceable.... In *McClellan v. Kennedy,* 8 Md. 230[,

248] (1855), we said: " 'If compromises are otherwise unobjectionable they will be binding, and the right will not prevail against the agreement of the parties, for the right must always be on one side or the other, and there would be an end of compromises if they might be overthrown upon any subsequent ascertainment of right contrary thereto.' The doctrine of compromises rests on this foundation." *Chernick v. Chernick*, 327 Md. 470, 481, 610 A.2d 770 (1992) (other citations omitted).

In refusing to enforce Harrell's agreement regarding damages, the trial court effectively immunized Harrell from the consequences of deliberately breaching his obligations under the Settlement Agreement. We agree with SYSCO that, as a matter of policy and practice, if an employee is permitted to disregard the covenants upon which he settled, and then avoid the damage remedy that he agreed to, then "no employer should consider a settlement in these types of cases because it will likely be left without adequate redress in the event of a breach."

It is this result that we find unreasonable in its contradiction of established law and policy favoring the enforcement of arm's-length settlement agreements. *See Long*, 371 Md. at 84–85, 807 A.2d 1. We therefore conclude that the Paragraph 7 stipulation that SYSCO is entitled to damages in the amount it paid Harrell to settle is both reasonable and enforceable.

We find direct support for this holding in *Bell–Atlantic–Washington, DC v. Zaidi*, 10 F.Supp.2d 575 (E.D.Va.1997), *aff'd*, 149 F.3d 1167 (4th Cir.1998) (applying District of Columbia law). In that case, as here, an employee agreed to settle his discrimination and personal injury claims against his employer in a written settlement agreement. The language in the damages clause of that agreement was analogous to the language used in the agreement now before us. One term of the *Zaidi* settlement agreement required the employee to cease his frequent contacts to the employer and others regarding his allegations against the employer. If the employee violated this no-contact covenant, the employer was entitled to

the return of its settlement money. This agreement was set forth in the following language, which we find substantively similar to the language used in Paragraph 7: "in addition to any other remedies available to [the employer] for [employee's] breach of this paragraph[,] ... [employee] will immediately return to the Company any payments already made to [employee]." *Id.* at 577.

There are also material similarities in the circumstances in which these employees executed and breached the agreement. Zaidi had 21 days to decide whether to sign the agreement, and another seven days after he executed the agreement to rescind. Here, the Settlement Agreement states that Harrell had "at least one week before the date on which he signed it ... to allow him to consult with an attorney[,]" and at least six weeks thereafter to note any objections before it was approved by the Workers' Compensation Commission. Zaidi received $150,000 to settle his discrimination and injury claims against his employer, but breached his no-contact covenant three years later. Harrell received $185,00 to settle his discrimination and injury claims, but he breached his no-disparagement covenant just five months later.

In *Zaidi,* as in this case, the employer filed a breach of contract action, seeking to recover damages equal to what it paid to settle the employee's claims. *See id.* at 576. Granting the employer's motion for summary judgment, the federal district court enforced the stipulated damages remedy in the settlement agreement. Significantly, the court's decision did not rest on a liquidated damages or "unreasonable penalty" analysis. More specifically, it did not measure the validity of the damage remedy by asking whether the employee's violation of the no-contact covenant could reasonably be anticipated to cause the employer $150,000 in damages. Nor did the court require the employer to prove actual damages. *See id.* at 578. Rather, judgment was entered against the employee for the full $150,000 paid by the employer under the terms of the settlement agreement. *See id.* In an unpublished decision, the Fourth Circuit affirmed the reasoning of the district court. *See Bell Atlantic–Washington DC v. Zaidi,* 149 F.3d at 1167.

■ We concur with the decision and rationale in *Zaidi*, for the reasons set forth above. When, as here, parties settle litigation with the aid and advice of independent counsel, using unambiguous language expressing their mutual agreement to establish a stipulated remedy in the event of a specified breach, we must have a compelling reason to justify refusing to enforce such an explicit and negotiated cornerstone of that agreement.

In this case, as in *Zaidi*, we find no reason to deny SYSCO its bargained-for damage remedy. The parties agreed that Harrell's covenant not to disparage SYSCO was a "substantial and material" inducement for SYSCO to settle Harrell's claims, and that, given "the difficulty of proving prejudice to the Company in the event" Harrell breached this covenant, SYSCO is entitled to damages equal to the settlement money it paid Harrell.

We hold that the trial court erred in refusing to enforce the stipulated damage remedy in Paragraph 7. Accordingly, we must vacate the damage award and remand for entry of an award in accordance with the Settlement Agreement.

## II.

### Actual Damages

As alternative grounds for this appeal, SYSCO complains that the trial court erred in refusing to let the jury decide the amount of its actual damages. We must resolve this assignment of error because our decision regarding stipulated damages does not necessarily preclude SYSCO from recovering additional damages. As discussed in Part I, SYSCO is entitled to recover all of its actual damages resulting from Harrell's breach of both Paragraph 7 and Paragraph 16's prohibition against aid to third parties. Thus, if SYSCO can prove other actual "damages flowing from" Harrell's breach of the non-disparagement and "no aid" clauses, the company might be entitled to recover such damages.

At trial and before this Court, however, SYSCO conceded that it did not offer any evidence that its pecuniary loss exceeded the $185,000 it paid in "peace money." To the contrary, counsel for SYSCO acknowledged the company's inability to prove such damages, observing that "this type of harm, which is reputational in nature, is hard, if not impossible, to quantify in dollar terms." Given this record, SYSCO is not entitled to a new jury trial on actual damages.

**DAMAGE AWARD IN THE JUDGMENT VACATED AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**