NAZARIAN, J.
As the majority states up front, “the primary issue in this case is whether the absolute litigation privilege may immunize a party to a non-disparagement agreement from liability for breaching that agreement when the breach was words spoken by a lawyer or witness in court, during a judicial proceeding.” Op. at 496, 113 A.3d at 1131 (emphasis added). The majority answers that question in the affirmative and I agree with that general principle as far as it goes. Here, though, the circuit court erred in applying that principle on a motion to dismiss posture and despite the hotly disputed factual question about the meaning and scope of the Agreement.[1] And this matters because, in my view, these sophisticated parties could properly have waived the litigation privilege if, as a matter of fact, it *532 applied at all. Their ability to waive it flows from the fact that this privilege, like all privileges, protects them, and specifically their ability to participate freely in the judicial process. Put another way, there would be no question that the City could waive any claims or defenses it could assert against OBG or CDG in exchange for $10 million (or, for that matter, any other privilege), and I see no reason why the City could not equally (wisely or not) waive its right to take certain positions in future litigation as part of its settlement with OBG, even if that were viewed as a waiver of the litigation privilege.
1. OBG’s claims should not have been dismissed.
Because we are reviewing a decision to grant a motion to dismiss, I begin with the complaint, which includes two counts that sound in contract, not tort, and turn on the scope of the non-disparagement provision of the Agreement. OBG alleges that in exchange for $10 million, among other things, the City agreed not to make disparaging comments or remarks about OBG and its work on the Salisbury wastewater treatment plant. The City counters that the non-disparagement clause was not meant to limit its positions or testimony in the Plant Upgrade Case. This is an intractable point of dispute, one that the circuit court didn’t resolve and that we can’t resolve on the present record (nor should we). See Samuels v. Tschechtelin, 135 Md.App. 483, 527, 763 A.2d 209 (2000) (noting that it is not “the function of the motions court to consider matters outside the pleadings in order to resolve disputed facts”); see also Debbas v. Nelson, 389 Md. 364, 372, 885 A.2d 802 (2005) (“In reviewing the underlying grant of a motion to dismiss, we must assume the truth of the well-pleaded factual allegations of the complaint, including the reasonable inferences that may be drawn from those allegations.”).
But instead of assuming the truth of the allegations here, the circuit court found (in language the majority cites, op. at 503, 113 A.3d at 1135-36) when it denied the request for a TRO that when the parties executed the Agreement, it was “clear ... that the question of the ... appropriateness of [OBG’s] design of the [plant upgrade] would remain an issue *533 in the [Plant Upgrade Case].” (Emphasis added.) That assumption (if not a finding) leaped over a dispute of fact that required the court to deny the motion to dismiss.[2] Indeed, it is just as obvious for present purposes that OBG intended (or at least could have intended) the non-disparagement clause to limit the City’s future litigation positions, and common-sense reasons support such a reading. First, to permit the City here to use litigation as a sword and a shield (offensively as the plaintiff in the Plant Upgrade Case against CDG, and defensively to prevent any recourse by OBG), seems to ignore the $10 million settlement. The City was not merely reacting, but came out swinging when it argued in its opening statement that “most of the problems [at the plant] were design problems created by the design engineer, [OBG].” [3] In light of the public attention this case garnered in the local press (and the complaint alleges as much), it is not unreasonable to think that an agreement not to disparage could have been intended to include disparaging statements made in court. Second, although the majority may be correct that “[e]vidence about flaws in OBG’s design for the plant upgrade and any cause and effect between flaws in the design and the plant upgrade failure was indispensable to an informed factual resolution of the City’s contract claim against CDG,” the truth of that premise either depends on the resolution of facts disputed by these parties or resort to materials out of bounds for a motion to dismiss. And finally, the City cannot prevail on a motion to dismiss even if I were to agree that the non-disparagement *534 clause obviously covered the Plant Upgrade Case without saying so because OBG’s complaint alleges otherwise.
The circuit court erred, in my view, when it skipped over the threshold question of whether the parties actually intended to include litigation within the scope of the non-disparagement clause in the Agreement. And beyond the mere procedural error, resolution of this question would have framed OBG’s breach of contract claims more precisely. If the court or a jury were to find that the parties did not intend the non-disparagement claims to encompass the parties’ positions in the Plant Upgrade Case, that would end the case, since the City could not have breached the Agreement in that manner. But if the court or a jury were to make the opposite finding, the court would assess the City’s privilege claim (and whether the Agreement waived it) against the backdrop of that finding. For the reasons I explain next, that context matters.
2. These parties could have waived the litigation privilege.
If the litigation privilege were to apply at all, I take a different view of how it applies, beginning with its scope. The majority refers frequently to the privilege as “absolute,” and I agree that the privilege applies absolutely to the in-court statements of a party or witness when it applies. I respectfully disagree, though, that the privilege is absolute in the sense that parties cannot waive it.
Privileges may, as the litigation privilege and attorney-client privilege both do, serve broader societal purposes. See, e.g., Mixter v. Farmer, 215 Md.App. 536, 543, 81 A.3d 631 (2013) (“The absolute privilege is broad and comprehensive in order to serve its purpose to foster the ‘free and unfettered administration of justice.’ ” (quoting Keys v. Chrysler Credit Corp., 303 Md. 397, 404, 494 A.2d 200 (1985))). But privileges don’t exist in a vacuum — they attach to and protect individuals and parties. The litigation privilege protects the whole range of participants in the litigation process, and it applies differently to different players: witnesses, parties, and judges enjoy total *535 immunity from tort liability for statements made in a judicial proceeding, whereas statements by attorneys must bear “some rational relation to the matter at bar.” Norman v. Borison, 418 Md. 630, 650, 17 A.3d 697 (2011). At the most fundamental level, then, the scope of the privilege is a function of context: a witness can defame anyone about anything from the witness stand with malice and impunity, but a lawyer can’t do the same from the table or the podium. And so out of the box, “absolute” doesn’t really mean absolute.
Next, parties generally are free to waive privileges, such as the attorney-client, spousal, and other testimonial privileges, just as they can waive claims, defenses, arguments, and objections. They can do so for substantive reasons, tactical reasons, by neglect, or for no reason at all. Like the litigation privilege, these other privileges serve broader societal purposes — the attorney-client privilege, for example, furthers the broader purposes of justice by allowing clients to speak freely with counsel. See CR-RSC Tower I, LLC v. RSC Tower I, LLC, 429 Md. 387, 433, 56 A.3d 170 (2012). So in this case— where sophisticated parties to a complex infrastructure contract represented by able counsel settled complex litigation through an Agreement that featured an eight-figure payment from OBG to the City — I struggle to understand why, if it wanted to, the City could not agree as part of settling one case to limit the positions it could take in another, i.e., to try the Plant Upgrade Case on the theory that the plant failed because of faulty construction. Again, I don’t know and don’t opine on whether the parties in fact intended the non-disparagement clause to apply to arguments or testimony in the Plant Upgrade Case. But $10 million from OBG might well justify such an agreement, just as favorable treatment in settlements or plea bargains — or indeed, simply as a trial tactic — might justify a party’s decision in another case to waive another privilege. See, e.g., McCarthy v. United States, 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969) (“A defendant who enters [a guilty] plea simultaneously waives several constitutional rights, including his privilege against compulsory self-incrimination ...”); United States v. Woodall, *536 438 F.2d 1317, 1325 (5th Cir.1970) (“By offering his own testimony as to a part of the conversation [with his counsel] relative to plea results, [the defendants] waived the right to claim the privilege as to the whole thereof.”); In re Nazari-an,[4] 18 B.R. 143, 147 (Bankr.D.Md.1982) (holding that the defendants could be held to have waived attorney-client privilege if they raised communications with their attorney in the course of testimony purely for their own benefit).
Moreover, an informed decision on the City’s part to try the case in an agreed fashion (in exchange for $10 million) doesn’t interfere with the due administration of justice or the ability of participants to speak freely. The City could readily have decided, on its own, for all sorts of reasons, to focus on faulty construction rather than faulty design. Perhaps, for example, a jury would be more likely to understand a trial theory focused entirely on faulty construction, or a narrower focus might allow the City to avoid presenting witnesses who might perform poorly on the stand or emphasizing documents that undermined its case. CDG would, of course, be free to defend the case however it wished, and the City’s strategic and tactical decisions might ultimately have consequences it regrets. But the litigation privilege does not compel parties to present the ideal case, or even their entire potential case — it protects their ability to participate as they wish, consistently with the law, without fear of civil liability, and I think it allows them to agree to forego claims or defenses or positions.
Neither the cases the majority cites nor the principles underlying them elevates the litigation privilege above informed waiver. First, our recent decision in Mixter presented the analytical inverse of the situation before us. Mixter, 215 Md.App. at 541-42, 81 A.3d 631. That case stands for two propositions; the one relevant here[5] is that the litigation privilege knocks out torts “beyond defamation when those *537 torts arise from the same conduct as the defamation claim.” Id. at 547, 81 A.3d 631 (emphasis added). The linchpin there was the alleged defamation. Allowing other tort claims grounded in that same defamatory statement to go forward simply because they had other titles would, as the majority notes correctly, have elevated form over substance in á manner inconsistent with the privilege. See Op. at 522, 113 A.3d at 1147. But here, OBG is seeking to enforce a contract altogether separate from the Plant Upgrade Case, and specifically its contractual right not to be disparaged (the scope of which, again, is disputed). To apply the Mixter principle to these facts would require us to hold that the enforceable scope of the non-disparagement clause depends in the first place on whether a tort claim (that is not alleged) might be barred by the litigation privilege. This seems backwards. And neither Mixter nor any other case I have found independently limits a party’s right to agree not to disparage, not to take litigation positions, or to waive privileges.
Second, the out-of-state cases the majority cites don’t account for the important competing interest — previously recognized by this Court — in encouraging settlement and bringing litigation to finality. The majority looks to a case cited by the City, Rain v. Rolls-Royce Corp., 626 F.3d 372 (7th Cir.2010), in which the United States Court of Appeals for the Seventh Circuit held that the absolute litigation privilege protected an aircraft engine manufacturer for two purported breaches of a non-disparagement agreement it had executed with a seller of engine parts in settling a prior suit. The non-disparagement provision was nothing like the one at issue here: it said simply that “None of the Parties will disparage the others.” Id. at 375. When the manufacturer made allegations in another complaint that disparaged the seller, it sued and asserted that the manufacturer had breached the non-disparagement agreement. The manufacturer moved for summary judgment, arguing that the absolute litigation privilege applied to bar the suit under the law of Indiana. The trial court granted summary judgment in favor of the manufacturer and the seller appealed. Id. at 376.
*538 The Seventh Circuit held that Indiana observed an absolute privilege protecting all “relevant statements made in the course of a judicial proceeding,” in order to preserve the “due administration of justice by providing actors in judicial proceedings with the freedom to participate without fear of future defamation claims.” Id. at 376 (quoting Hartman v. Keri, 883 N.E.2d 774, 777 (Ind.2008)); see also Kelly v. Golden, 352 F.3d 344, 350 (8th Cir.2004) (noting that Missouri provided an absolute litigation privilege covering statements made in judicial proceedings, again relying on “the policy favoring freedom of expression and the desire not to inhibit parties from detailing and advocating their claims in court.”) In the Rain court’s view, Indiana favored a “liberal rule” that shrouded with the privilege all statements but “those allegations that are ‘so palpably irrelevant to the subject matter of the controversy that no reasonable man can doubt [their] irrelevancy and impropriety.’ ” Rain, 626 F.3d at 377 (quoting Miller v. Reinert, 839 N.E.2d 731, 735 (Ind.Ct.App.2005) (brackets in original)). Notably, however, the court determined that the appellants had waived the argument that Indiana’s policy favoring the enforcement of contracts outweighed the importance of the litigation privilege by failing to raise it in the district court. Id. at 378. (And importantly for our purposes, there was more than one issue waived at the district court level — the appellants also waived the argument that Rolls-Royce had waived the absolute privilege by agreeing to the non-disparagement clause. Id.) The court also viewed the contract claim effectively as one sounding in tort — i.e., a defamation claim — and determined only in that context that the privilege barred liability based on a violation of the agreement. Id.
Whether because it viewed the policy argument as being waived or for other reasons, Rain overlooked the important countervailing principle that parties are free, and should be encouraged, to settle lawsuits by agreement rather than resorting to litigation. See Smelkinson SYSCO v. Harrell, 162 Md.App. 437, 875 A.2d 188 (2005) (discussed below). For that reason, I find more persuasive the California Court of Ap *539 peals’s analysis in Wentland v. Wass, 126 Cal.App.4th 1484, 25 Cal.Rptr.3d 109 (Cal.Ct.App.2005). In that case, the parties settled a dispute involving Mr. Wentland’s management of a local property development company, Parkview Terrace, in which Messrs. Reiss and Wass were partners. Id. at 1487-88, 25 Cal.Rptr.3d 109. The settlement provided that Mr. Reiss would not make any statements that “may have the effect of impugning [Mr. Wentland’s] honesty or integrity,” and further provided that Mr. Reiss would sign a letter of apology. Id. at 1489, 25 Cal.Rptr.3d 109. As part of a later lawsuit by Messrs. Reiss and Wass against certain partnerships managed by Mr. Wentland, the latter moved for summary judgment. Id. at 1487, 25 Cal.Rptr.3d 109. Messrs. Wass and Reiss opposed the motion by producing an accountant’s declaration, along with their own affidavits, that according to Mr. Went-land, contained information that violated their prior non-disparagement agreement. The trial court dismissed Mr. Wentland’s cross-complaint, reasoning in part that his breach of contract claim was barred by the litigation privilege, which is codified in California as Cal. Civ.Code § 47(b). Id. at 1487-88, 25 Cal.Rptr.3d 109. The court began by explaining the circumstances under which the privilege applies:
Section 47(b) provides in part that a privileged communication is one made in a judicial proceeding. “The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.”
Id. at 1490, 25 Cal.Rptr.3d 109 (quoting Silberg v. Anderson, 50 Cal.3d 205, 266 Cal.Rptr. 638, 786 P.2d 365 (1990) (citations omitted)).
After looking at prior cases, the court held that the privilege applied absolutely with regard to tort claims, but that no court had precluded any and all breach of contract claims based on the privilege, and that “whether the litigation privilege applies to an action for breach of contract turns on whether its application furthers the policies underlying the privilege.” Id. *540 at 1492, 25 Cal.Rptr.3d 109 (citations omitted). The court concluded that no one can use the litigation privilege to shield himself from all liability, and that one can validly contract to waive the litigation privilege. Id. at 1494, 25 Cal.Rptr.3d 109. And in that case, the court determined that the policies behind the privilege were “not furthered by its application in this case”:
This cause of action is not based on allegedly wrongful conduct during litigation ... Rather, it is based on a breach of a separate promise independent of the litigation .... This breach was not simply a communication, but also wrongful conduct or performance under the contract, ... [and] here application of the privilege would frustrate the purpose of the Parkview Terrace agreement.
Id. at 1494, 25 Cal.Rptr.3d 109 (emphasis added). The court saw no reason to allow the party who had, on the one hand, voluntarily agreed to keep silent to use the litigation privilege later to circumvent, on the other hand, the non-disparagement clause and the party’s prior agreement:
Application of the litigation privilege in this case does not encourage finality and avoid litigation. In reaching settlement in the Parkview Terrace matter, the parties presumably came to an acceptable conclusion about the truth of Reiss’s comments about Wentland’s management of the partnership. Allowing such comments to be made in litigation, shielded by the privilege, invites further litigation as to their accuracy and undermines the settlement reached in the Parkview Terrace matter.

Id.

The privilege here arises, if at all, in the context of a litigation settlement agreement that conferred rights and imposed obligations on both sides (including,, again, a $10 million payment from OBG to the City). We explained in Smelkinson that non-disparagement clauses in settlements are valuable and enforceable:
What SYSCO bought through the negotiated settlement ... was immediate and long-term “peace” with Harrell, with the *541 attendant right to expect that it would no longer have to expend money, effort, or goodwill in responding to his disparaging allegations. The language [in the contract] and the circumstances surrounding the execution of the Settlement Agreement leave no doubt that SYSCO and Harrell struck a bargain that was designed to prevent precisely what happened here — that SYSCO would pay Harrell $185,000 to drop all his allegations, claims and agitations against the company, only to have Harrell later resume them.
Smelkinson, 162 Md.App. at 453, 875 A.2d 188. And as we permitted SYSCO to recover damages against Mr. Harrell based on his breach of a non-disparagement clause, we also pointed out Maryland courts’ long-standing reluctance to nullify a “negotiated remedy at the heart of a settlement agreement,” id.:
“The law always favors compromises and amicable adjustments of disputes, rather than compel parties to resort to litigation and it would be strange if, in the absence of clear evidence of fraud or mistake, the parties were not bound and concluded after what has taken place in respect to this award.”
Id. (quoting Sisson v. Baltimore, 51 Md. 83, 95-96 (1879)).
The ultimate question, then, is whether the City agreed, as part of settling its differences with OBG, not to disparage OBG in the Plant Upgrade Case. The outcome of that question depends in the first instance on what the parties intended the non-disparagement clause to cover. The circuit court erred in dismissing the case in the face of that looming factual dispute, and I would reverse and remand on that basis. From there, I would hold that the City could well have agreed to limit its litigation positions in the ongoing litigation, whether viewed as a positional or tactical decision or as a waiver of the litigation privilege, and direct the circuit court on remand to address OBG’s claims against that backdrop. And for those reasons, I respectfully dissent.

. The circuit court and the majority both assume, correctly on this posture, that the statements themselves were disparaging, and I will as well. I express no views on whether in fact they are disparaging, or whether they would violate the Agreement if the merits of the issue were reached.

. The court did not exactly go outside the complaint, which would have had the effect of converting the motion to dismiss to one for summary judgment. See D'Aoust v. Diamond, 424 Md. 549, 574, 36 A.3d 941 (2012) (noting that where "the trial judge clearly looked outside the 'four comers of the complaint’ in reviewing Respondents' Motion to Dismiss, [he] thereby converged] it into a Motion for Summary Judgment'.’). Instead, the court assumed an answer — the opponent's answer — to the disputed question.

. Although OBG claims that the disparaging statements were "publicly reported” in an Eastern Shore newspaper, the article included in the Record Extract does not identify OBG by name.

. No relation.

. The other proposition is that letters prepared and sent for the purpose of preparing for litigation are protected by the privilege in the same way as in-court statements. Id. at 544.