REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1734

September Term, 2012

O'BRIEN & GERE ENGINEERS, INC.

v.

CITY OF SALISBURY

Eyler, Deborah S.,
Nazarian,
Moylan, Charles E., Jr.
        (Retired, Specially Assigned),

JJ.

Opinion by Eyler, Deborah S., J.
Dissenting Opinion by Nazarian, J.

Filed: April 28, 2015

The primary issue in this appeal is whether the absolute litigation privilege may immunize a party to a non-disparagement agreement from liability for breaching that agreement when the breach was by words spoken by a lawyer or witness in court, during a judicial proceeding. We hold that it may, and that in the circumstances of this case it did, as a matter of law.

## FACTS AND PROCEEDINGS

The parties to this appeal are O'Brien & Gere Engineers, Inc. ("OBG"), the appellant, and the City of Salisbury ("City"), the appellee. In the early 2000's, the Maryland Department of the Environment ("MDE") directed the City to upgrade its outdated wastewater treatment plant to comply with federally mandated standards. In 2004, the City contracted with OBG to perform the design engineering for the plant upgrade. The next year, the City contracted with Construction Dynamics Group, Inc. ("CDG") to serve as the construction manager for the plant upgrade. Among other things, CDG's contract required it to oversee OBG's design engineering work and report any problems with the design to the City.

It is an understatement to say the plant upgrade did not go well. The City paid over $80 million dollars for the upgrade, but the plant as upgraded never satisfied federal standards. Ultimately, the MDE required the City to complete an entirely new plant upgrade.

On February 28, 2011, in the Circuit Court for Wicomico County, the City sued OBG and CDG, alleging breaches of contract and wrongful acts and omissions that caused the plant upgrade to fail ("The Plant Upgrade Case"). OBG joined a number of subcontractors

and some of their sureties as third party defendants. The City amended over against the third party defendants, and OBG filed cross-claims against them. The parties engaged in extensive discovery. Expert witnesses were disclosed in early 2012. The case was specially assigned and given a November 1, 2012 trial date.

On June 7, 2012, the City and OBG entered into a comprehensive settlement, which they memorialized in a written Settlement Agreement ("the Agreement"). The salient terms are as follows. OBG agreed to pay the City $10 million ($10,000,000) and the City agreed to release OBG from all claims the City had made or could have made against it relating to the plant upgrade. All claims, cross-claims, and third-party claims relating to OBG would be dismissed and OBG would dismiss a separate suit it had brought against the City under the Maryland Public Information Act ("MPIA"). No provision of the Agreement would "inure to the benefit of" anyone else, including any other party to the Plant Upgrade Case.

OBG denied fault and tortfeasor status. The City and OBG agreed that if, at the trial of the Plant Upgrade Case, OBG were found to be a tortfeasor, then any judgment in tort in favor of the City would be reduced in accordance with the Maryland Uniform Contribution Among Joint Tort-Feasors Act. *See* Md. Code (2013 Repl. Vol.), §§ 3-1401 *et seq.*

The City agreed to defend, indemnify, and hold harmless OBG from any claim made against it at any time by any other party to the Plant Upgrade Case, relating to the design or construction of the Plant. The stated purpose of this provision was to protect OBG from having to expend "any further monies" in connection with the Plant Upgrade Case and,

2

together with the joint tortfeasor provision, to protect OBG "from any liability and expense associated with any claims that the City is now pursuing, or hereafter may initiate or pursue, against any person other than OBG arising from or in any way relating to the [plant upgrade] and the facts and events alleged by the City in the [Plant Upgrade Case]." In addition, the City agreed to defend, indemnify, and hold harmless OBG from any claim or suit made or filed against it at any time concerning the design and construction of the plant upgrade. In consideration for the release and indemnification agreements, OBG agreed to release the City from any claims -- past, present, and future -- relating to the plant upgrade, except claims for enforcement or breach of the Agreement.

Central to this appeal, the Agreement contains a mutual non-disparagement clause:

> The City and [OBG] mutually agree that they will not make, or cause or encourage other persons or entities to make, any disparaging remarks or comments about each other relating to any matter having occurred prior to the effective date of this Settlement Agreement or in the future relating directly or indirectly to the Salisbury wastewater treatment plant through any means, including without limitation, oral, written or electronic communications, or induce or encourage others to publicly disparage the other settling party.

"Disparaging" is defined to mean:

> [A]ny statement made or issued to the media, or other entities or persons that adversely reflects on the other settling party's personal or professional reputation and/or business interests and/or that portrays the other settling party in a negative light.

In addition, the clause states with respect to injunctive relief and damages:

> The parties agree that, in the event of any breach of this non-disparagement provision, damages/actual losses will be difficult or impossible to prove with requisite precision, and that an adequate remedy at law will not exist.

3

Accordingly, in the event of a breach of this provision, the non-breaching party shall be entitled to equitable relief including but not limited to a temporary restraining order, a preliminary injunction, and a permanent injunction. Further, the non-breaching party shall not be required to post any bond in connection with seeking or obtaining a temporary restraining order, a preliminary injunction, and/or a permanent injunction. Further, the non-breaching party shall be entitled to an award of reasonable attorney's fees and other litigation costs and expenses associated with enforcement of this provision against the breaching party.

The Agreement does not include a confidentiality or non-disclosure provision.

The Council of the City of Salisbury approved the Agreement the day it was signed. Five days later, after receiving the $10 million payment, the City filed a stipulation of voluntary dismissal with prejudice of OBG from the Plant Upgrade Case. OBG voluntarily dismissed with prejudice its cross-claims and the MPIA case. Soon thereafter, the City dismissed with prejudice the claims it had filed against the defendants originally brought into the case by OBG. That left CDG as the only remaining defendant. The City filed an amended complaint against CDG for breach of contract only, with an *ad damnum* clause reduced from $60 million dollars to $4 million dollars.

The jury trial in the Plant Upgrade Case began on schedule on November 1, 2012. The City advocated that CDG had breached its contract in a number of ways, including by failing to oversee OBG's design engineering work and by failing to bring flaws in that work to the City's attention; and that those design flaws caused the plant upgrade to fail. The City theorized that CDG did not report the problems with OBG's design engineering because the year before CDG executed its contract with the City, CDG and OBG had entered into a

4

"teaming agreement," in which they were collaborating to win a $20 million construction contract in the District of Columbia, and it would not have served CDG's interests in seeking that lucrative contract to reveal OBG's design flaws in the plant upgrade.[1]

In opening statement, the City's lawyer told to the jurors that the evidence would show that CDG's contract required it to inform the City of any design flaws in the plant upgrade, but that CDG failed to do so:

> This becomes very important. Because most of the problems at this plant, and this plant was a disaster, *most of the problems were design problems created by the design engineer, [OBG]. And [CDG] should have been advising the City of those problems.* Particularly when, you'll hear at the end of the project, this plant didn't work. But [CDG] walked away, they didn't advise the City.

(Emphasis added.) He continued:

> [CDG] [f]ailed to provide the required information in their monthly reports. They failed to tell us about all of the things that weren't working. They failed to tell us about *the myriad of design problems* that they should have told us about. *Remember the word design*.

(Emphasis added.) The lawyer foreshadowed the evidence about the teaming agreement, characterizing it as a conflict of interest on CDG's part:

> I'll talk to you about conflicts of interest. Why didn't CDG report the engineer [OBG]? Why didn't CDG come to the City and say the engineer is causing problems or has caused problems big time? *The engineering was a mess*. This engineering, you'll hear, most of it failed. But CDG wasn't reporting that. Why?
> Well, what we found out is, remember, CDG is hired in 2005, in 2004 *CDG entered into what's called a teaming agreement with the engineering*

---

[1]CDG and OBG in fact obtained the District of Columbia contract.

**firm [OBG] an agreement to try to get a job in the District of Columbia.** A job in the District of Columbia, which, if they got it, would give them 20 million dollars for the package. Millions each. **Six million for CDG. Six million for [OBG], O'Brien and Ge[re].** Six million for another partner. They entered into a teaming agreement in 2004.

* * *

So you're going to – it doesn't matter to us whether they [CDG] mistakenly and in breach of their contract declared this plant substantially complete because they're incompetent or because **they're in bed with the engineer** . . .

(Emphasis added.) The City's lawyer mentioned OBG by name four times in his opening statement.

CDG's defense was that it had fulfilled all its contractual obligations to the City by ensuring that the plant was upgraded in accordance with specifications. It took the position that OBG's design, not anything it had done or not done, caused the plant upgrade to fail; and it was not responsible for OBG's design failures and could not have done anything to make the upgraded plant functional. In his opening statement, CDG's lawyer explained that OBG's design for the plant upgrade was "experimental" and emphasized that as the construction manager, CDG's responsibilities did not include uncovering the problems with that design. CDG's lawyer mentioned OBG by name 23 times in his opening statement.

The evidence phase of the trial began the next day. The City called Enos Stover, Ph.D., an expert in environmental engineering. On direct examination, Dr. Stover was asked to identify component-by-component the failures in the plant upgrade. He did so, opining that most of the components failed due to "design issues." On cross-examination, Dr. Stover stated that OBG's design for the plant upgrade had been "likely to fail" from the outset. The

6

City then called John Jacobs, the former director of the City's Department of Public Works. Mr. Jacobs testified that under the terms of its contract with the City, CDG was responsible for overseeing OBG's work, including bringing any "design issues" to the City's attention.

That same day, the *Daily Times*, a Salisbury newspaper, published a story headlined, "Attorneys set stage in city sewer plant trial." The story summarized the opening statements in the Plant Upgrade Case, quoting the City's lawyer as having said that CDG was "in bed – partners – with the very engineering firm they were supposed to watch." It reported that CDG's lawyer countered, "There's nothing a construction manager can do to make a failed design work. . . There was no harm caused to the [C]ity by CDG because the project was built on time, on budget and with no construction deficiencies." The article, which described the plant upgrade as "the largest public works project in the [C]ity's history," did not identify OBG by name.

OBG's lawyer read the *Daily Times* article and immediately ordered trial transcripts and sent the City a "cease and desist" letter. In the letter, he said he was "monitoring" the trial, quoted the non-disparagement clause in the Agreement, and "instruct[ed] the City, its attorneys, and any witnesses it calls to testify at trial to comply strictly and fully [with that clause]," by "regulat[ing] [its] conduct at trial (in regard to [its] arguments and [its] questioning of any and all witnesses)" and by "prepar[ing] [its] witnesses accordingly, so that OBG is not disparaged . . . in any way."

7

On November 5, 2012, after receiving the trial transcripts, OBG's lawyer filed a "Complaint for Injunctive and Other Relief" against the City, also in the Circuit Court for Wicomico County, alleging that the City had breached the non-disparagement clause of the Agreement by the words spoken by its lawyer in opening statement at the trial of the Plant Upgrade Case and by Dr. Stover and Mr. Jacobs in their trial testimony. It sought a temporary restraining order ("TRO") and preliminary and permanent injunctive relief, claiming it would suffer "immediate substantial and irreparable injury" if the City were not enjoined from making disparaging statements about it in the ongoing trial in the Plant Upgrade Case. It asked the court to "restrain[] and enjoin[] the City (and its counsel, witnesses, employees, and officials) from making any statements at the trial in the [Plant Upgrade Case] or otherwise that portray OBG in a negative light" and to award it attorneys' fees. It also sought $1.5 million in damages.[2]

On November 7, 2012, the City and OBG appeared for a hearing on the TRO request, before the same judge specially assigned to the Plant Upgrade Case. The trial in that case still was in progress. OBG argued that the City was violating the non-disparagement clause

_____

[2]OBG attached the following documents to its complaint: the Agreement; excerpts of trial transcripts for November 1 and 2, 2012; the *Daily Times* article; an affidavit by the lawyer for OBG who sent the cease and desist letter; the cease and desist letter; and an affidavit by an executive vice president of OBG summarizing the provisions of the Agreement, quoting from the opening statement given by the City's lawyer, summarizing the testimony of Dr. Stover and of Mr. Jacobs, and asserting that the opening statement and witness testimony had disparaged OBG in violation of the Agreement, and that OBG would suffer irreparable harm if a TRO were not issued.

by making arguments and introducing evidence critical of OBG's design work on the plant upgrade. The City responded that, among other things, it was evident when the parties entered into the Agreement that if the Plant Upgrade Case went to trial, other defendants would be taking the position that OBG's design had caused the plant upgrade to fail, and therefore had caused the City's injuries and damages. It argued that in any event the non-disparagement clause could not be enforced to restrain speech by lawyers and witnesses in a judicial proceeding because words spoken in that setting are covered by the absolute litigation privilege.

The court denied the request for a TRO. The judge opined that the non-disparagement clause was "enforceable between the parties" and that the City and OBG were "bound by [its] terms." He concluded, however, that when the City and OBG executed the Agreement, it was "clear . . . that the question of the . . . appropriateness of [OBG's] design of the [plant upgrade] would remain an issue in the [Plant Upgrade Case]," and therefore evidence critical of OBG's design would be introduced and commented upon in any trial of the case.

Also on November 7, 2012, the City moved to dismiss OBG's complaint and OBG amended its complaint, adding a count for unjust enrichment. Two days later, OBG noted an appeal from the interlocutory order denying a TRO.

The trial in the Plant Upgrade Case continued until November 16, 2012, when the jury returned a verdict in favor of the City and against CDG for $1,968,417.43 in damages.

On November 19, 2012, the City filed an amended motion to dismiss OBG's amended

9

complaint. It argued that the conclusion of the trial in the Plant Upgrade Case had rendered the request for injunctive relief moot; the Agreement only permitted injunctive relief, not damages, for breach of the non-disparagement clause; and if recovery of damages were permitted under the terms of the Agreement, OBG did not state a claim for which relief could be granted, because the absolute litigation privilege immunized the City from liability for damages based on the words spoken by its lawyer and witnesses in the trial of the Plant Upgrade Case, including any liability for damages for breach of the non-disparagement clause.

OBG filed an opposition, arguing that its claim for equitable relief was not moot because, in all likelihood, CDG would appeal the judgment against it [3]; the language of the Agreement permits equitable relief *and* damages; the absolute litigation privilege only applies to defamation actions, not to any other cause of action, including an action for breach of contract; and the City entered into the Agreement with full knowledge that the non-disparagement clause would foreclose it from criticizing OBG's design work at any trial in the Plant Upgrade Case.

Shortly before the hearing on the motion to dismiss, OBG filed a motion to disqualify the City's counsel of record. Citing Maryland Lawyer's Rules of Professional Conduct

---

[3]In fact, CDG noted an appeal from the judgment entered in favor of the City in the Plant Upgrade Litigation. It did not prevail. On January 17, 2014, this Court filed an unreported opinion affirming the judgment in favor of the City. *Construction Dynamics Group v. City of Salisbury*, No. 2404, Sept. Term, 2012. CDG filed a petition for writ of *certiorari,* which the Court of Appeals denied. 438 Md. 143 (2014).

("MRPC") 3.7 (Lawyer as Witness), it asserted that because the conduct and statements of the lawyers representing the City in the trial of the Plant Upgrade Case were directly at issue, they were "necessary witnesses" and could not continue to act as advocates for the City.[4] The City countered that the motion to disqualify was premature given the pending motion to dismiss because, were the court to grant that motion, the case would come to an end without any witness testimony.

On December 21, 2012, the court held a hearing on the pending motions. It denied the motion to disqualify counsel, agreeing that it was premature. It granted the motion to dismiss on the basis of the absolute litigation privilege. Noting that the gravamen of the complaint "relate[d] solely to statements and utterances spoken by witnesses and lawyers within the confines of the courtroom," the judge concluded that although the law respects "the principles that protect non-disparagement agreements, the larger principle" of "permitting, encouraging free statements, vigorous statements, between the parties and lawyers to aid in the resolution of a dispute is paramount." Thus, even if in trying its case against CDG the City breached the Agreement by disparaging OBG's design work on the

_____

[4]MRPC 3.7 states, in pertinent part, that "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless . . . the testimony relates to an uncontested issue; . . . or . . . disqualification of the lawyer would work substantial hardship on the client."

plant upgrade, the absolute litigation privilege protected the City from liability for that breach.[5]

The court entered a judgment dismissing the case with prejudice. OBG noted an appeal, which was consolidated with its earlier appeal from the order denying its TRO request.

OBG poses three questions for review, which we have rephrased slightly:

I.      Did the circuit court err in granting the City's motion to dismiss?

II.     Did the circuit court abuse its discretion in denying OBG's TRO request?

III.    Did the circuit court err in denying OBG's motion to disqualify counsel?

We hold that in the circumstances of this case, the circuit court's decision to dismiss OBG's claims on the basis of the absolute litigation privilege was legally correct. We further hold that the court did not abuse its discretion in denying the TRO request or err in denying the motion to disqualify counsel.

## DISCUSSION

---

[5]The circuit court did not address the City's argument that the language of the non-disparagement clause regarding injunctive relief and damages limited a non-breaching party to injunctive relief for a breach of the non-disparagement clause, thus prohibiting the recovery of damages against the breaching party. By granting the City's motion to dismiss on the basis of the absolute litigation privilege, after already denying injunctive relief, it appears that the court assumed that the clause permits recovery of damages. The parties do not address this issue on appeal. If it were argued, the issue could, conceivably, moot the absolute litigation privilege issue; but again, the parties do not address it.

**I.**

**<u>Motion to Dismiss</u>**

We review *de novo* a circuit court's decision to grant a motion to dismiss a complaint for failure to state a claim for which relief can be granted. *Gasper v. Ruffin Hotel Corp. of Md., Inc.*, 183 Md. App. 211, 226 (2008). In so doing, "we must assume the truth of the well-pleaded factual allegations of the complaint, including the reasonable inferences that may be drawn from those allegations." *Adamson v. Corr. Med. Servs., Inc.*, 359 Md. 238, 246 (2000). "Dismissal is proper only when the alleged facts and permissible inferences, even if later proven to be true, would fail to afford relief to the plaintiff." *Morris v. Osmose Wood Preserving*, 340 Md. 519, 531 (1995). "In sum, because we must deem the facts to be true, our task is confined to determining whether the trial court was legally correct in its decision to dismiss." *Adamson*, 359 Md. at 246.

Although not in this order, OBG offers three reasons to support its contention that the circuit court's decision to grant the motion to dismiss was legally incorrect. First, the court engaged in fact finding, which it must not do in ruling on a motion to dismiss for failure to state a claim for which relief can be granted. Second, the plain language of the non-disparagement clause covers any disparaging statement made in any setting, including in the course of a judicial proceeding. Finally, the absolute litigation privilege did not apply because it only immunizes litigation participants from liability for defamation and the

13

purpose of the privilege will not be served if it is applied to protect them from liability for breach of contract.

**(a)**

We can quickly dispose of OBG's first two arguments. OBG is correct that in ruling on a motion to dismiss, the circuit court is not to make factual findings. *See Magnetti v. Univ. of Md.*, 171 Md. App. 279, 284 (2006) (motion to dismiss is decided based upon "allegations" not upon "evidence"). However, the record does not support its assertion that the court made factual findings in ruling on the motion to dismiss. The court granted the motion upon a determination that if the City breached the non-disparagement clause of the Agreement by the words of its lawyer and its witnesses spoken at the trial of the Plant Upgrade Case, the City could not be held liable for that breach, because it was immunized from liability by the absolute litigation privilege. This ruling did not involve any fact finding.[6]

OBG's argument that the language of the non-disparagement clause covers any disparaging remark made in any setting, including in the course of a judicial proceeding, is not pertinent to whether the court erred in granting the motion to dismiss. In making its

---

[6]During the hearing on the TRO request, the court made remarks that could be interpreted as factual findings. The court did not make any factual findings when it granted the motion to dismiss, however.

ruling, the court *assumed* that the City could breach, and did breach, the non-disparagement clause by words spoken by its lawyers and witnesses at the trial of the Plant Upgrade Case.[7]

**(b)**

We turn to OBG's third argument -- the central issue in this case -- that the court erred as a matter of law in ruling that the absolute litigation privilege immunized the City from liability for breaching the non-disparagement clause of the Agreement by words spoken in the trial of the Plant Upgrade Case.

Well over 100 years ago the Court of Appeals recognized in Maryland common law an absolute litigation privilege that immunizes litigation participants from liability in tort for words spoken or written in the course of a judicial proceeding. *Hunckel v. Voneiff*, 69 Md. 179 (1888). *See also Bartlett v. Christhilf*, 69 Md. 219 (1888). It crafted an absolute litigation privilege for Maryland that is a hybrid of the English and American versions of that privilege. Lawyers are protected by the American version, which immunizes them from liability in tort for words spoken or written in the course of a judicial proceeding so long as the words are relevant to the proceeding. *Norman v. Borison*, 418 Md. 630, 650 (2011).[8]

[7]As the dissent points out, the parties were in dispute over whether the non-disparagement clause applied to the Plant Upgrade Case. Because the court *assumed* that it did, *i.e.*, *assumed OBG's position* in the dispute, there was no need for a factual resolution of the dispute. Therefore, contrary to the argument made by the dissent, the dispute did not preclude the court from granting the motion to dismiss based on the absolute litigation privilege.

[8]In the case at bar, there is no dispute that the words spoken by the City's lawyer during the trial in the Plant Upgrade Case were relevant to the proceeding.

15

Other litigation participants, including witnesses, are protected by the English version of the privilege, which immunizes them from liability in tort for words spoken or written in the course of a judicial proceeding even when the words are irrelevant and incidental. *Hunckel*, 69 Md. at 193.

In both the American and English versions of the absolute litigation privilege, the privilege applies notwithstanding that the litigation participant's "purpose or motive was malicious, [that] he [or she] knew that the statement was false, or [that] his [or her] conduct was otherwise unreasonable." *Adams v. Peck*, 288 Md. 1 (1980). *See also Gersh v. Ambrose*, 291 Md. 188, 192 (1981) (stating that under both the American and the English versions of the absolute litigation privilege, the privilege is not "defeasible by malice.").

The purpose of the absolute litigation privilege is to protect "the free and unfettered administration of justice," *Bartlett*, 69 Md. at 226, by "serv[ing] the ultimate goal of information exchange and discovery of the truth." *Norman*, 418 Md. at 660 (footnote omitted). The privilege is an essential component of the adversary system of justice.[9] In that system, the truth of a dispute is decided by a neutral fact-finder in a judicial proceeding where each party, ordinarily through counsel, advocates his position by presenting evidence, challenging his opponent's evidence through cross-examination and otherwise, and arguing

_____

[9]The absolute litigation privilege dates to the emergence of the adversary system in the common law of medieval England. *Briscoe v. LaHue*, 460 U.S. 325, 330-31 (1983) ("The immunity of parties and witnesses from subsequent damages liability for their testimony in judicial proceedings was well established in English common law") (footnote omitted) (citing *Cutler v. Dixon*, 76 Eng. Rep. 886 (K.B. 1585)).

16

in favor of what the party sees as the just result. It is key to this process that all evidence material to the search for the truth be available to the decision-maker, regardless of whether the evidence harms, could harm, or appears to harm someone's reputation.[10]

Because "[t]he ultimate purpose of the judicial process is to determine the truth," participants in a legal proceeding must be free to speak without "fear of private suits for defamation." *Adams*, 288 Md. at 5. A witness who faces the prospect of civil liability for the words he speaks at trial will be reluctant to testify, and if he does testify, may distort his testimony to protect himself. "[T]he fear of subsequent liability" may limit or skew the evidence the decision-maker needs to fairly decide the case. *Briscoe*, 460 U.S. at 333. It therefore is of "great importance to the administration of justice that witnesses should testify with minds absolutely free from the apprehension of being annoyed by civil actions for any thing they may say as witnesses." *Hunckel*, 69 Md. at 198. *See also Gersh*, 291 Md. at 192 (observing that the absolute litigation privilege exists not "merely to protect [a litigation participant] from ultimate liability, but [also] to protect him from the annoyance of suit itself."). The absolute litigation privilege is so important to the administration of justice in an adversary system that it will apply even though an "incidental result" may be protection of an "evil disposed and malignant slanderer." *Bartlett*, 69 Md. at 226.

---

[10]To be sure, there are evidentiary limits on the information the decision-maker can receive, but they too are designed to advance the judicial process, by ensuring that decisions are made fairly.

17

Lawyers are duty bound by the Maryland Lawyer's Rules of Professional Conduct to zealously advocate for their clients, which includes introducing evidence that supports their clients' positions and presenting argument in furtherance of their clients' claims or defenses. *See Preamble to MRPC* ("as advocate, a lawyer zealously asserts the client's position under the rules of the adversary system."). The specter of civil liability for words spoken or written in the course of a judicial proceeding will inhibit lawyers from abiding by their professional obligation to advocate zealously, imperiling the rights of their clients. *See* T. Leigh Anenson, "*Absolute Immunity from Civil Liability: Lessons for Litigation Lawyers*," 31 Pepp. L. Rev. 915, 922 (2004); *see also Greenberg Traurig, LLP v. Frias Holding Co.*, 331 P. 3d 901, 903 (Nev. 2014) (explaining that "[t]he policy behind the [litigation] privilege, as it applies to attorneys participating in judicial proceedings, is to grant them as officers of the court the utmost freedom in their efforts to obtain justice for their clients.") (internal quotation marks and citations omitted) (alteration in *Greenberg*).

**(c)**

Until 2013, every reported Maryland opinion about the absolute litigation privilege arose in the context of a defamation action, that is, an action in which the plaintiff alleged that he had been defamed by words spoken or written by the defendant during a trial or in another phase of the judicial process. That changed when this Court decided *Mixter v. Farmer*, 215 Md. App. 536 (2013). Mixter, a lawyer, sued Farmer, also a lawyer, for defamation, intentional infliction of emotional distress, tortious interference with contract,

18

and tortious interference with prospective advantage. The claims stemmed from derogatory statements Farmer made about Mixter in letters Farmer sent to other lawyers and to one of Mixter's former clients seeking information for an anticipated (and eventually filed) grievance with the Maryland Attorney Grievance Commission.[11]

This Court held that the absolute litigation privilege insulated Farmer from liability for all the claims against him, not just the defamation claim. We reasoned that, when liability is sought based on a common set of events concerning words spoken or written in the course of or in connection to a judicial proceeding, the precise theory of recovery is not determinative. The underlying policy of protecting the adversary system of justice by enabling full and free expression in judicial proceedings is implicated, regardless of the theory of recovery, and is advanced by applying the absolute litigation privilege. The absolute litigation privilege protected Farmer from liability for claims against him that were based on the words he wrote in the course of a judicial proceeding, whether packaged as a cause of action for defamation or as causes of action for intentional infliction of emotional distress, tortious interference with contract, or tortious interference with prospective advantage.

---

[11] The Court of Appeals has held that the absolute litigation privilege applies to some quasi-judicial proceedings, depending upon the nature of the right the proceeding is meant to protect and the presence of procedural safeguards. *Gersh*, 291 Md. at 196-97. Attorney Grievance Commission Proceedings have been held to be quasi-judicial proceedings to which the absolute litigation privilege applies. *See Kerpelman v. Bricker*, 23 Md. App. 628, 630 (1974).

In so holding, we examined Maryland cases in which other immunities have been applied to protect litigation participants from liability not only for defamation but also for other causes of action. For example, in *Walker v D'Alesandro*, 212 Md. 163, 169 (1957), the Court held that the public official privilege was not "confined in the law of torts to matters of defamation." Likewise, in *Carr v. Watkins*, 227 Md. 578, 582 (1962), the Court held that the qualified privilege enjoyed by certain police officers when performing their duties applies not only to a claim for defamation but also to claims for invasion of privacy, divulging information without legal right, malicious interference with contract of employment, and conspiring to cause termination of employment. The *Carr* Court observed that "if there was immunity from liability for defamation, there was immunity from liability for the other alleged torts claimed . . . to have been committed" as the "privilege is not limited to immunity from liability for defamation." *Id*. at 583.

We pointed out in *Mixter* that other state appellate courts have "support[ed] the expansion of immunity beyond defamation torts when those other torts arise from the same conduct." 215 Md. App. at 547. *See, e.g.*, *Sullivan, D.D.S., P.C. v. Birmingham*, 416 N. E. 2d 528, 533 (Mass. App. Ct. 1981) (absolute litigation privilege is a complete defense to action for intentional infliction of emotional distress); *Rainier's Dairies v. Raritan Valley Farms*, 117 A. 2d 889, 895 (N.J. 1955) (absolute litigation privilege is a complete defense to an action for malicious interference with business).

20

*See also Briscoe*, 460 U.S. at 325 (absolute litigation privilege protected defendant from liability in claim for violation of civil rights under 42 U.S.C. section 1983 based on statements made during trial); *Buschel v. MetroCorp*, 957 F. Supp. 595, 598 (E.D. Pa. 1996) (absolute litigation privilege "applies equally in causes of action for invasion of privacy"); *Pinto v. Internationale Set, Inc*., 650 F. Supp. 306, 309 (D. Minn. 1986) (absolute litigation privilege "entitles defendant to judgment on plaintiffs' claim for intentional interference with contractual and business relations"); *LaPlante v. United Parcel Service, Inc.*, 810 F. Supp. 19 (D. Me. 1993) (absolute litigation privilege applies to action for sex discrimination, harassment, and constructive discharge); *Loomis v. Tulip*, *Inc.*, 9 F. Supp. 2d 22, 25 (D. Mass. 1998) (absolute litigation privilege applies to action for tortious interference with contract; "it remains well-established that the privilege applies 'not only in defamation cases, but as a general bar to civil liability based on [an] attorneys's [sic] statements'" (quoting *Blanchette v. Cataldo*, 734 F.2d 869, 877 (1st Cir. 1984))); *W. Technologies, Inc. v. Sverdrup & Parcel, Inc*., 739 P.2d 1318 (Ariz. Ct. App. 1986) (absolute litigation privilege applies to bar action for injurious falsehood and intentional interference with contractual relationship).

**(d)**

The Maryland appellate courts have not addressed whether and in what circumstances the absolute litigation privilege will immunize a litigation participant from liability for speaking or writing disparaging words about a person in the course of a judicial proceeding, when the participant had contracted not to disparage that person. A handful of federal and

state appellate courts have analyzed this issue. The most widely cited opinion on this topic is *Rain v. Rolls-Royce Corporation*, 626 F.3d 372 (7th Cir. 2010) (applying Indiana law).

Rolls-Royce and Paramount International, Inc., were competitors in the business of repairing certain model Rolls-Royce helicopter engines. Rolls-Royce sued Paramount and David Rain, Paramount's sole shareholder, for misappropriating Rolls-Royce's intellectual property. The parties settled the case in a written agreement governed by Indiana law. The agreement included a mutual non-disparagement clause. A year later, Rolls-Royce sued several other business competitors in a federal district court in Texas ("the Texas Lawsuit"), alleging that they had engaged in racketeering in order to obtain its proprietary information, and had done so in conspiracy with Paramount and Rain.[12]

When Paramount and Rain learned of the Texas Lawsuit, they sued Rolls-Royce in an Indiana federal district court for breach of contract, asserting, *inter alia*, that Rolls-Royce's racketeering allegations disparaged them, in violation of the non-disparagement clause in their settlement agreement. Rolls-Royce moved for partial summary judgment, invoking the absolute litigation privilege. The Indiana federal district court granted the motion, reasoning that even if Rolls-Royce's allegations of wrongdoing against Paramount and Rain in the Texas Lawsuit disparaged them, in breach of the settlement agreement, Rolls-Royce was "immune from liability under Indiana's absolute litigation privilege." *Id*. at 376.

---

[12]Rolls-Royce did not identify Paramount and Rain by name in its complaint. It referred to them as the "Principal Corporation" and "Mr. Doe." 626 F.3d at 375. It was evident to all concerned that the references were to Paramount and Rain, however.

22

Following a bench trial on Paramount and Rain's remaining claims, they appealed, challenging the grant of partial summary judgment.

Guided by the policy underlying Indiana's long-recognized absolute litigation privilege, the Seventh Circuit affirmed. The purpose of the privilege, the court explained, is to "'preserv[e] the due administration of justice by providing actors in judicial proceedings with the freedom to participate without fear of future defamation claims.'" *Id*. (alteration in *Rain*) (quoting *Hartman v. Keri*, 883 N.E.2d 774, 777 (Ind. 2008)). The court reasoned that a claim for breach of a contract not to disparage that is based on words spoken or written in the course of a judicial proceeding is "largely indistinguishable from a tort claim alleging injury flowing from statements made in a judicial proceeding," and that, ordinarily, Indiana's absolute litigation privilege would immunize Rolls-Royce from liability for its wrongful allegations against Paramount and Rain in the Texas Lawsuit.[13] 626 F.3d at 378.

The *Rain* court emphasized that the question before it was not whether the non-disparagement agreement was enforceable at all, in any circumstance. Rather, it was whether, assuming that Rolls-Royce's allegations against Paramount and Rain in the Texas Lawsuit disparaged them, in breach of the agreement, Rolls-Royce should be subject to liability for that breach. The court held that it should not, because the purpose of the absolute

---

[13] Indiana's absolute litigation privilege is the American version of the privilege, which is not as broad as Maryland's hybrid English/American privilege. It does not differ from the Maryland privilege in any way that is of consequence here, however. As to words spoken or written by lawyers, both privileges require the words to be relevant to the proceedings. In that case, as here, the words at issue plainly were relevant to the proceedings.

litigation privilege would be advanced if it were applied to protect Rolls-Royce from liability for breaching the non-disparagement agreement. It reasoned that ensuring that Rolls-Royce could make use of the courts for their intended purposes -- for example to protect its intellectual property rights against third parties -- without fear that doing so would expose it to future liability would serve the administration of justice. "By contrast, the failure to apply the privilege would frustrate the underlying policy [of the privilege] by discouraging Rolls-Royce from exercising its fundamental right to resort to the courts to protect its rights." *Id*. at 378. Therefore, Rolls-Royce's words, spoken or written in the course of the Texas Lawsuit, would not expose it to liability in contract for breach of the non-disparagement agreement, any more than they would expose it to liability in tort.

Seven years before the Seventh Circuit's decision in *Rain*, the Eighth Circuit Court of Appeals reached a like conclusion in *Kelly v. Golden*, 352 F.3d 344 (8th Cir. 2003), although the settlement agreement in *Kelly* differed from that in *Rain*. Kelly and Golden had been business partners. When their working relationship deteriorated, Kelly sued Golden in federal district court. The two settled the case in a written agreement that included a clause in which each party agreed not to "disparag[e]" or "defam[e]" the other and not to disclose any information about the agreement, or a prior agreement, unless it was "privileged, within arbitration proceedings, made with consent, or required by law." *Id*. at 348.

The ink was barely dry on the agreement when Kelly sued Golden in a Missouri state court seeking rescission and alleging among other claims breach of fiduciary duty. Golden

removed the case to federal district court and filed a counterclaim. Kelly, who was self-represented, filed "lengthy pleadings containing irrelevant and scandalous allegations that reflected his anger and personal feelings regarding the case." *Id*. The court struck some of the pleadings and admonished Kelly to refrain from making personal attacks in his filings, to no avail. Kelly continued on the same path and also sent letters and faxes to Golden and his lawyer containing "numerous inappropriate, vituperative, and coercive comments, along with arguably defamatory statements." *Id*. at 349.

After the district court granted summary judgment in favor of Golden on Kelly's claims, Golden amended his counterclaim, alleging that Kelly had breached the non-disparagement clause of their settlement agreement by his court filings, and seeking injunctive relief, damages, and attorneys' fees. Golden filed a motion for summary judgment, which the court granted, enjoining Kelly from further disparaging or defaming him. Kelly appealed.

The Eighth Circuit reversed. It explained that, although Kelly's disparaging statements could have subjected him to "court-initiated sanctions," he was exempt from liability for breaching the non-disparagement agreement, because his disparaging statements were made in the course of a judicial proceeding and therefore "were protected by the absolute privilege." *Id*. at 350. The court emphasized that the policy underlying the absolute litigation privilege "favor[s] freedom of expression and the desire not to inhibit parties from detailing and advocating their claims in court." *Id*.

25

In *Wentland v. Wass*, 25 Cal. Rptr. 3d 109 (Cal. Ct. App. 2005), a California intermediate appellate court applied a similar analysis but reached a different result. Charles Wentland, Warren Wass, and Walter Reiss (and various trusts they controlled) were partners in Parkview Terrace, a real estate investment partnership. When Parkview Terrace started to fail, Wass and Reiss began to suspect that Wentland had been misappropriating funds. They hired a certified public accountant ("CPA") to audit the partnership's books. Wentland denied any wrongdoing and cooperated with the audit. Ultimately, Wentland, Wass, and Reiss settled their differences without litigation. The terms of the settlement were bare bones: Wentland agreed to purchase Wass and Reiss's interest in Parkview Terrace in consideration for Wass and Reiss agreeing not to disparage Wentland's management of Parkview Terrace; and the parties all agreed the settlement would be kept confidential.[14]

Wass and Reiss held interests in other real estate investment partnerships that Wentland managed. Sometime after entering into the Parkview Terrace settlement, Wass and Reiss sued three of the other real estate investment partnerships and Wentland, seeking an accounting. Wentland moved for summary judgment on the ground that there were no allegations of wrongdoing to support an accounting. Wass and Reiss filed an opposition, to which they attached a "declaration" by the CPA who had audited Parkview Terrace's books. In the "declaration," the CPA stated that the Parkview Terrace audit had revealed self-dealing

_____

[14]Wass and Reiss also provided Wentland with a letter of apology that Wentland could use if Wass and Reiss violated the agreement.

26

by Wentland. Wass and Reiss argued that this was sufficient evidence of wrongdoing to support their request for an accounting.

Wentland reacted by filing a counterclaim, alleging that the assertions of wrongdoing made against him in the opposition to summary judgment and the CPA's "declaration" disparaged him, in violation of the settlement agreement, and further breached that agreement by making it public. Wass and Reiss moved to dismiss the counterclaim, arguing that California's statutory absolute litigation privilege for civil cases protected them from liability to Wentland for the words they had written in documents filed in court and for the words written in the "declaration."[15] The court granted the motion to dismiss. After Wass and Reiss's claims were decided by the court, Wentland noted an appeal from the dismissal of his counterclaim.

The California Court of Appeal for the Third District reversed, holding that California's absolute litigation privilege did not insulate Wass and Reiss from liability for breaching the non-disparagement agreement. Like the courts in *Rain* and *Kelly*, the *Wentland* court focused its analysis on whether applying the privilege would advance its underlying policies. The court opined that the purposes of the absolute litigation privilege are to "ensure free access to the courts, promote complete and truthful testimony, encourage zealous advocacy, give finality to judgments, and avoid unending litigation." *Id*. at 115. It concluded

---

[15]California Civil Code section 47 states in pertinent part: "[a] privileged publication or broadcast is one made . . . (b) In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, . . . ."

27

that immunizing Wass and Reiss from liability for breaching their settlement agreement with Wentland would not "further[]" "the policies underlying the privilege," *id*. at 116, explaining:

> Unlike in the usual derivative tort action, application of the privilege in the instant case does not serve to promote access to the courts, truthful testimony or zealous advocacy. This cause of action is not based on allegedly wrongful conduct during litigation . . . . Rather, it is based on breach of a separate promise independent of the litigation . . . . This breach was not simply a communication, but also wrongful conduct or performance under the contract . . . . [H]ere application of the privilege would frustrate the purpose of the [non-disparagement agreement.]
>
> Application of the privilege in this case does not encourage finality and avoid litigation. In reaching settlement in the Parkview Terrace matter, the parties presumably came to an acceptable conclusion about the truth of [Wass and] Reiss's comments about Wentland's management of the [Parkview Terrace] partnership. Allowing such comments to be made in litigation, shielded by the privilege, invites further litigation as to their accuracy and undermines the settlement reached in the Parkview Terrace matter.

*Id*. at 116-17

More recently, an intermediate appellate court in another district in California held that the absolute litigation privilege applied to protect a litigation participant from liability for breaching a non-disparagement agreement. In *Vivian v. Labrucherie*, 153 Cal. Rptr. 3d 707 (Cal. Ct. App. 2013), Labrucherie's boyfriend, nicknamed "Dodi," sought injunctive relief against her ex-husband, Vivian, a county deputy sheriff. Dodi alleged that Vivian was harassing him by following him in his patrol car and telling law enforcement officials in Dodi's native country that Dodi was being investigated by the sheriff's department. The court granted a TRO. Soon thereafter, Vivian asked the sheriff's department to open an internal affairs investigation into Dodi's allegations.

The following month Vivian and Dodi entered into a settlement. Dodi agreed to drop his request for a permanent injunction and he, Vivian, and Labrucherie agreed not to disparage "any other party." *Id.* at 710. Even though she was not a party, Labrucherie signed the settlement agreement and represented that (with an exception not relevant here) she would be bound by it.

A year later, Vivian sued Labrucherie, her mother, and Dodi, alleging among other things that Labrucherie had violated the settlement agreement by making disparaging statements about him to people in the sheriff's office's internal affairs department, during its investigation.[16] Labrucherie moved to dismiss the complaint, arguing the absolute privilege protected her from liability for breaching the non-disparagement agreement. The court denied the motion, and she noted a permitted interlocutory appeal.

The appellate court reversed, holding that the absolute litigation privilege insulated Labrucherie from liability for breaching the non-disparagement agreement by means of her communications about Vivian to the sheriff's department. It found that applying the privilege would "further[] the policies underlying the privilege." *Id.* at 715. Specifically, in the context of police investigations, that policy is "'to assure utmost freedom of communication between citizens and public authorities whose responsibility it is to investigate and remedy wrongdoing.'" *Id.* (quoting *Williams v. Taylor*, 181 Cal. Rptr. 423,

---

[16] Vivian also alleged that Labrucherie and her mother had conspired to have Dodi file the petition for injunctive relief for an improper purpose, based on false information they had fed him.

428 (1982). The court observed that the dispute involved "a significant public concern -- a governmental investigation into inappropriate conduct by a police officer [-- and that] [t]he public purpose is served by application of the privilege here in a way that does not apply to statements made in many other contexts." *Id*. at 716.

Finally, and most recently, a Florida intermediate appellate court analyzed principles of waiver in holding that the absolute litigation privilege immunized a party to a non-disparagement agreement from liability for breaching that agreement by words written in the course of a judicial proceeding. In *James v. Leigh*, 145 So. 3d 1006 (Fla. Dist. Ct. App. 2014), the parties were former law partners. They entered into an agreement that included a mutual non-disparagement clause. Later, James recited disparaging facts about Leigh in a motion James filed in his ongoing divorce case. Specifically, in seeking to set aside a marital settlement agreement, James alleged that his earnings had declined because Leigh had fired him and James's expectation that he would take over the law practice, because Leigh was facing disciplinary action, proved unfounded when the disciplinary proceedings against Leigh were dismissed.

Leigh brought a contract action against James, alleging that he breached the non-disparagement clause of their agreement by including derogatory information about him in the motion filed in the divorce case. James moved to dismiss, invoking the absolute litigation privilege. The court denied the motion. James noted an interlocutory appeal, challenging that ruling.

30

Before the appellate court, Leigh argued that the absolute litigation privilege did not protect James from liability for breaching the non-disparagement clause because, by entering into an agreement that included a non-disparagement clause, James had waived the absolute litigation privilege. In other words, without an exception in the non-disparagement clause for words spoken or written in the course of a judicial proceeding, the absolute litigation privilege was waived.

The appellate court rejected the waiver argument and held that the absolute litigation privilege applied. It observed that as a matter of law "'an individual cannot waive a right designed to protect both the individual and the public.'" *Id.* at 1008-09 (quoting *Chames v. DeMayo*, 972 So. 2d 850, 860 (Fla. 2007)). It concluded that because the absolute litigation privilege protects a public right, an individual cannot waive it:

> Since the absolute litigation privilege is a firmly established right of immunity designed to protect the public by ensuring the free and full disclosure of facts in the conduct of judicial proceedings, we conclude the parties' non-disparagement agreement could not be construed as a waiver of the privilege.

*Id*. at 1009. On that basis, the appellate court reversed the denial of the motion to dismiss. *See also Iskanian v. CLS Transp. Los Angeles, LLC*, 327 P.3d 129, 148-49 (Cal. 2014) (employee could not waive in arbitration agreement the right to bring a representative action for labor code violation because the statute permitting those actions protected a public right); *Andrews v. Wisconsin Public Serv. Corp.*, 762 N.E.2d 837, 840 (Wis. Ct. App. 2008) (explaining that "[p]ersonal rights may be waivable, but public rights are not" and holding the power of eminent domain effectuates a public purpose and may not be waived); *Campbell*

31

*v. Mahoney*, 29 P.3d 1034 (Mont. 2001) (distinguishing between nonwaivable public rights and waivable private rights and concluding that Montana's "good time" statute for inmates was waivable).[17]

### (e)

As our review of the decisional law shows, there is a strong trend favoring application of the absolute litigation privilege to immunize litigation participants from liability for any tort claim (not just defamation) that is based on words written or spoken in the course of a judicial proceeding. Just as this Court concluded in *Mixter*, courts elsewhere have concluded that what matters is not the cause of action alleged but whether immunity from tort liability will advance the policies the privilege is meant to protect. That substance-over-form analysis likewise has guided the courts that have considered whether the absolute litigation privilege will immunize a litigation participant from liability for breaching a non-disparagement agreement by words written or spoken in a judicial proceeding. Significantly, none of these courts have held that the absolute litigation privilege will not apply merely because a cause of action against a litigation participant that is based on words spoken or written in the course of judicial proceeding sounds in contract, not tort. Instead, they have considered whether

---

[17] In *Rain*, Paramount and Rain argued before the Seventh Circuit that Rolls-Royce had waived the absolute litigation privilege by entering into the non-disparagement agreement. The *Rain* court declined to consider that argument because it had not been raised in the district court.

immunity from liability is consistent with and will serve the public policy objectives of the privilege, and have applied the privilege when that is the case.

We agree with this consensus view. The absolute litigation privilege is a policy implementing tool. Ordinarily, a person has a right to legal redress in tort for words spoken or written in violation of a duty recognized in the law, when the elements of the tort are proven. If the words that form the basis for the tort were spoken or written in the course of a judicial proceeding, the individual right to redress is trumped by the paramount public right to judicial proceedings that afford the trier of fact "free and unfettered" access to information necessary to its search for the truth. *Bartlett*, 69 Md. at 226. When people bargain privately for restrictions on the words they may speak or write about each other, such as by a non-disparagement agreement, they may obtain legal redress for a violation of that privately imposed duty through a cause of action for breach of contract. If the breach of such a contractual duty is by words spoken or written in the course of a judicial proceeding, however, the public right to the fair administration of justice is implicated. It is the context in which the breaching words are communicated -- in the course of a judicial proceeding -- that involves the absolute litigation privilege, whether the breach is of a duty in tort or a right afforded by contract. The individual contractual right to redress will yield to the public right -- that is, the absolute litigation privilege will apply -- when in the particular case that "would promote the due administration of justice and free expression by participants in judicial proceedings." *Rain*, 626 F.3d at 378.

33

This approach comports with the principles the Court of Appeals has followed in assessing the scope of the absolute litigation privilege in Maryland, for instance, as applied to extrinsic statements. "We extend the absolute privilege to [certain categories of out of court] statements for the traditional reason - to encourage the free divulgence of information in pursuit of justice." *Norman*, 418 Md. at 654 (holding that the absolute litigation privilege protected lawyers from liability for defamation for allegations made in a complaint not yet filed in court and given to the news media for publication). *See, e.g., Adams*, 288 Md. at 8 (extending the absolute litigation privilege to defamatory statements made in documents prepared for use in litigation, but not filed, because "[t]he evaluation and investigation of facts and opinions for the purpose of determining what, if anything, is to be raised or used in pending litigation is as integral a part of the search for truth . . . as is the presentation of such facts and opinions during the course of the trial . . ."); *Offen v. Brenner*, 402 Md. 191, 202 (2007) (commenting that "the basis for extending absolute immunity [is] to prevent unduly hindering important speech, and to ensure that otherwise actionable conduct thus is protected where the accused acts in furtherance of a recognized socially important interest.") (quotation omitted).

We must consider, then, whether in the circumstances of this case application of the absolute litigation privilege to immunize the City from liability for breaching its non-disparagement agreement with OBG "would promote the due administration of justice and free expression by participants in judicial proceedings." *Rain*, 626 F.3d at 378. As

34

discussed, in the Plant Upgrade Case, the City was seeking to recover from OBG and CDG $60 million of the $80 million in public funds it had spent on the failed upgrade to its wastewater treatment plant.[18] The City recovered $10 million in its settlement with OBG, and the case proceeded to trial on a $4 million contract claim against CDG. In broad terms, the jury's task was to decide whether CDG had breached its contract with the City and, if so, whether the breach had caused the plant upgrade to fail.

The City's claims against OBG, which were settled, and its claims against CDG, which went to trial, were facets of the same litigation -- the Plant Upgrade Case -- and that litigation concerned a single project -- the plant upgrade. OBG designed the plant upgrade and CDG managed its construction, under a contract that required it to inform the City about any problems with the upgrade's design. Consequently, the facts material to whether CDG breached its contract with the City were interrelated with the facts material to whether OBG's design was flawed. Likewise, the facts relevant to whether any breach of contract by CDG caused the plant upgrade to fail were not separable from the facts relevant to whether OBG's design caused the plant upgrade to fail.

Evidence about flaws in OBG's design for the plant upgrade and any cause and effect between flaws in the design and the plant upgrade failure was indispensable to an informed factual resolution of the City's contract claim against CDG. Without assessing OBG's

---

[18]The City amended its complaint to include additional defendants that OBG had brought into the case as third party defendants, but dismissed them after settling with OBG. Clearly, the target defendants in the case were OBG and CDG.

design work, the jury could not decide the "truth" of the contract claim. And given the broad definition of "disparaging" in the Agreement, no amount of censoring the evidence about OBG's design engineering and the reason for the plant upgrade failure could make that evidence *not* disparaging. Under the Agreement, a "disparaging" statement is one that "adversely reflects on the other settling party's [here, OBG's] personal or professional reputation and/or business interests and/or that portrays the other settling party [here, OBG] in a negative light." Evidence that there were flaws in OBG's design for the plant upgrade and that its design caused the upgrade to fail necessarily would portray OBG in a negative light, in violation of the Agreement. And of course that was so even if the evidence were true.[19]

The City was entitled to use the court system to seek compensation for the losses it sustained due to the failed plant upgrade; and it did so, blaming the failure on OBG and CDG, the only defendants named in its original complaint. The City's settlement with OBG did not limit its right to continue to use the court system, in the same case, to pursue its claims against CDG. Indeed, the Agreement expressly provided that it would not inure to the benefit of any other party to the Plant Upgrade Case. The facts underlying the Plant

---

[19]The City's "conflict of interest" evidence regarding the "teaming agreement" between CDG and OBG did not disparage OBG beyond the assertion that OBG's design was flawed. It disparaged CDG. The "conflict of interest" evidence (as prefaced by the City's lawyer in his opening statement) was being used by the City to show that CDG did not report the design flaws as its contract with the City required it to do because criticism of OBG by CDG could jeopardize CDG's interest in obtaining the District of Columbia contract.

Upgrade Case and the disputes about those facts were the same before and after the City's settlement with OBG, as was the interconnection between OBG's design work and CDG's contract supervision work. To decide the truth of the City's contract claim against CDG, the jurors needed the same "unfettered access" to the evidence relevant to the upgrade's design that they would have had absent the settlement between OBG and the City.

Without a complete body of evidence pertaining to OBG's design, the jurors would be left to make findings critical to the contract claim against CDG on a record sanitized of important facts -- including facts the jurors might credit as true -- merely because those facts could place OBG in a negative light. To carry out their public function, the jurors in the Plant Upgrade Case needed access to all the evidence necessary to put together the puzzle of facts, not to select puzzle pieces cherry-picked to protect OBG's reputation. The administration of justice would be served (and was served) by applying the absolute litigation privilege to immunize the City from liability for breaching the non-disparagement agreement by introducing evidence and making arguments to the trier of fact that included negative information about OBG's design of the plant upgrade.

There are additional circumstances that militate in favor of applying the absolute privilege in this case. The non-disparagement clause did not preclude CDG from introducing evidence disparaging OBG's design for the plant upgrade. In fact, CDG did so. As noted, a central theme in its defense was that OBG's design was so flawed that the upgrade was bound to fail, regardless of anything it did or did not do. Absent countervailing evidence

37

from the City that CDG knew about OBG's design flaws and failed to apprise the City about them, as was required by the terms of its contract, the jurors would be deciding the contract claim on but a portion of the relevant evidence, and OBG's design would be disparaged anyway.[20]

Also, just as the court in *Rain* recognized, the issue here is not whether the non-disparagement clause is enforceable at all, but whether it is enforceable when the disparaging words are spoken or written in the course of a judicial proceeding. The non-disparagement clause is fully enforceable as to any disparaging words spoken or written by the City about OBG's design work on the plant upgrade, outside of a judicial proceeding, and only is not

---

[20]In its brief, OBG asserts that under the indemnity clauses in the Agreement, if at the trial of the Plant Upgrade Case CDG were to criticize OBG's design for the plant upgrade, the City would have to respond by defending the design to the jury. This assertion discloses a complete misunderstanding not only of the indemnity language of the Agreement but also of the legal concept of indemnity. As explained, the City agreed to defend, indemnify, and hold harmless OBG from claims and suits brought against it by others arising out of the failed plant upgrade. The Agreement specifies that the City will defend OBG from such claims and suits "with counsel paid for and selected by the City." The plain meaning of this language is that, if a claim were made or a suit were filed against OBG arising out of its work on the plant upgrade, the City would be obligated to provide and pay for a lawyer to defend OBG in the claim or suit. "'Indemnity obligations, whether imposed by contract or by law, require the indemnitor to hold the indemnitee harmless from costs in connection with a particular class of claims,'" including the legal fees and costs incurred in defending an indemnified claim. *Nova Research, Inc. v. Penske Truck Leasing Co., L.P.*, 405 Md. 435, 453 (2008) (quoting *Peter Fabrics, Inc. v. S.S. Hermes*, 765 F. 2d 306, 316 (2d Cir. 1985)). The obligation of an indemnitor to "defend" an indemnitee is not an obligation to stand up and announce that the indemnitee did not commit any wrongdoing. It is an obligation to provide a legal defense to a claim or suit brought against the indemnitee. Moreover, CDG's defense in the Plant Upgrade Case -- that OBG's design was flawed and caused the plant upgrade to fail -- was not a claim or suit against OBG.

enforceable for words spoken or written in the course of a judicial proceeding when the fair administration of justice warrants otherwise. Accordingly, the purpose of the non-disparagement clause is not frustrated by application of the absolute litigation privilege.

This distinguishes the case at bar from *Wentland*, in which the court reasoned that applying the absolute litigation privilege to immunize Wass and Reiss from liability for breaching the non-disparagement agreement in the Parkview Terrace settlement would frustrate the purpose of that agreement. The non-disparagement agreement in *Wentland* was unilateral, running only from Wass and Reiss to Wentland, and was the *sole* consideration Wentland received in the Parkview Terrace settlement. In that circumstance, the *Wentland* court concluded that in entering into that settlement "the parties presumably came to an acceptable conclusion about the truth of [Wass and] Reiss's comments about Wentland's management of the partnership" -- *i.e.*, that they were *not* true. 25 Cal. Rptr. 3d at 116.

Allowing Wass and Reiss to support their allegations of wrongdoing in Wentland's management of other partnerships with evidence of wrongdoing by Wentland in managing Parkview Terrace that the parties had agreed was not true, when the only consideration Wentland had received in the Parkview Terrace settlement was Wass and Reiss's promise not to disparage him about his management of Parkview Terrace, would have rendered the Parkview Terrace settlement meaningless. And it would not have advanced the administration of justice in the case against Wentland and the other partnerships, because that case required evidence of wrongdoing by Wentland in managing those partnerships, not in

39

managing another partnership. As the *Wentland* court explained, it would not have promoted truthful testimony, because Weiss, Rain, and Wentland had agreed the Parkview Terrace allegations were not true; would not have promoted finality in litigation, because an already resolved issue would be resurrected for re-decision; and would not have promoted zealous advocacy because that does not encompass advocating a falsity.

By contrast, in the case at bar, the non-disparagement clause was mutual and was a single feature of a wide-ranging settlement between the City and OBG. The primary consideration OBG received for its $10 million dollar payment to the City was its release from liability for the City's claims against it that, if tried successfully, could have resulted in its liability for significantly more than that amount. In addition, the indemnity provisions of the Agreement freed OBG from the cost of defense and from having to pay any judgment or settlement in a suit or claim by another arising out of the failed plant upgrade (for example a claim for indemnification or contribution by CDG).

Unlike in *Wentland*, there was no agreement between the City and OBG that it was untrue that OBG's design was flawed or that its design had caused the plant upgrade failure. To be sure, OBG denied fault. The City did not agree that OBG was not at fault, however. Moreover, and significantly, the joint tortfeasor provision of the Agreement allowed for OBG's tortfeasor status to be proven at the trial of the Plant Upgrade Case. In other words, evidence could be introduced at trial that OBG had been negligent in its design engineering for the plant upgrade.

40

Here, the purpose of the non-disparagement clause was not frustrated by applying the absolute liability privilege to immunize the City from liability for the words used in arguing its case and presenting evidence at trial; and the fair administration of justice would have been frustrated had the privilege not been applied. In contrast to *Wentland*, applying the absolute litigation privilege in this case promoted access to the courts to resolve a dispute, presentation of truthful testimony, and zealous advocacy; and did not contribute to any lack of finality of judgments or repetitive litigation.[21]

As in *Rain*, if the absolute litigation privilege were not applied here, the City would have been deprived of its "fundamental right" to vigorously litigate its breach of contract claim against CDG without fear of liability for words spoken in court. 626 F.3d at 378.[22] In *Rain*, and in *Kelly*, the legal proceedings in which the disparaging words were spoken or written involved disputes between private parties enforcing private interests. The public

---

[21]We note, furthermore, that the Parkview Terrace settlement agreement included a confidentiality provision that Wentland alleged Wass and Reiss violated by the allegations in their opposition to the motion for summary judgment and the CPA's "declaration." In the case at bar, there was no confidentiality or non-disclosure provision in the Agreement. The City could have disseminated the Agreement, which on its face showed that OBG was paying the City a $10 million settlement to resolve the City's claim that OBG had negligently designed the plant upgrade.

[22]The dissent argues that the City could have limited the theories of liability it pursued against CDG to focus on faulty construction rather than faulty design. This overlooks two things. First, the Agreement specified that it would not inure to the benefit of any other party. Obviously, eliminating a viable theory of recovery against CDG would inure to CDG's benefit. Second, and even more important, breach *and* causation were integral elements of the City's contract claim against CDG; and causation -- what made the plant upgrade fail -- necessarily implicated any flaws in the design of the plant upgrade.

41

policy favoring "unfettered" access to information necessary to the decision-maker's truth-seeking function is even greater in the case at bar, as the taxpayers who funded the plant upgrade had an interest in the City's being compensated by CDG for breaching its contract. This is not unlike the "significant public concern" identified by the *Vivian* Court. As in that case, the "public purpose" of the absolute litigation privilege was advanced by its application here. 183 Cal. Rptr. at 716.

For all these reasons, under the circumstances of this case, the absolute litigation privilege applied as a matter of law to OBG's breach of contract action, and therefore the circuit court correctly dismissed OBG's amended complaint for failure to state a cause of action for which relief may be granted.[23]

## II.

## TRO

A circuit court's decision to deny a request for injunctive relief is reviewed for abuse of discretion. *Schisler v. State*, 394 Md. 519, 535 (2006). A court may issue a TRO only if it finds: (1) the plaintiff is likely to succeed on the merits; (2) the "balance of convenience" weighs in favor of the plaintiff; (3) the plaintiff will "suffer irreparable injury unless the injunction is granted"; and (4) "the public interest" weighs in favor of granting the temporary injunctive relief. *LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 300–301 (2004).

---

[23] As noted, OBG amended its complaint to add a claim for unjust enrichment. This claim is not addressed by the parties in their briefs.

In the instant case, the court did not abuse its discretion by denying OBG's request for a TRO.  As our holding makes plain, OBG was not likely to succeed on the merits of its claim because the absolute litigation privilege immunized the City from liability for breaching the non-disparagement agreement by words spoken by its lawyer and witnesses at the trial of the Plant Upgrade Case.  Moreover, under the fourth factor, the public interest weighed strongly in favor of the trial going forward without any restrictions on the City's presentation of its case.

## III.

## Motion to Disqualify Counsel

The circuit court denied OBG's motion to disqualify the City's lawyer because the motion was based on that lawyer's expected participation as a witness at trial, and that eventuality would not come to fruition if the motion to dismiss were granted.  The motion to dismiss then was granted, and, for the reasons we have explained, was properly granted.  The court did not err in denying OBG's motion to disqualify counsel.

**JUDGMENT AFFIRMED.  COSTS TO BE PAID BY THE APPELLANT.**

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1734

September Term, 2012

O'BRIEN & GERE ENGINEERS, INC.

v.

CITY OF SALISBURY

Eyler, Deborah S.,
Nazarian,
Moylan, Charles E., Jr.
    (Retired, Specially Assigned),

JJ.

Dissenting Opinion by Nazarian, J.

Filed: April 28, 2015

As the majority states up front, "the primary issue in this case is whether the absolute litigation privilege *may* immunize a party to a non-disparagement agreement from liability for breaching that agreement when the breach was words spoken by a lawyer or witness in court, during a judicial proceeding." Slip op. at 1 (emphasis added). The majority answers that question in the affirmative and I agree with that general principle as far as it goes. Here, though, the circuit court erred in applying that principle on a motion to dismiss posture and despite the hotly disputed factual question about the meaning and scope of the Agreement.[1] And this matters because, in my view, these sophisticated parties could properly have waived the litigation privilege if, as a matter of fact, it applied at all. Their ability to waive it flows from the fact that this privilege, like all privileges, protects *them*, and specifically their ability to participate freely in the judicial process. Put another way, there would be no question that the City could waive any claims or defenses it could assert against OBG or CDG in exchange for $10 million (or, for that matter, any other privilege), and I see no reason why the City could not equally (wisely or not) waive its right to take certain positions in future litigation as part of its settlement with OBG, even if that were viewed as a waiver of the litigation privilege.

---

[1] The circuit court and the majority both assume, correctly on this posture, that the statements themselves were disparaging, and I will as well. I express no views on whether in fact they are disparaging, or whether they would violate the Agreement if the merits of the issue were reached.

**1.  OBG's claims should not have been dismissed.**

Because we are reviewing a decision to grant a motion to dismiss, I begin with the complaint, which includes two counts that sound in contract, not tort, and turn on the scope of the non-disparagement provision of the Agreement.  OBG alleges that in exchange for $10 million, among other things, the City agreed not to make disparaging comments or remarks about OBG and its work on the Salisbury wastewater treatment plant.  The City counters that the non-disparagement clause was not meant to limit its positions or testimony in the Plant Upgrade Case.  This is an intractable point of dispute, one that the circuit court didn't resolve and that we can't resolve on the present record (nor should we).  *See  Samuels v. Tschechtelin*, 135 Md. App. 483, 527 (2000) (noting that it is not "the function of the motions court to consider matters outside the pleadings in order to resolve disputed facts"); *see also Debbas v. Nelson*, 389 Md. 364, 372 (2005) ("In reviewing the underlying grant of a motion to dismiss, we must assume the truth of the well-pleaded factual allegations of the complaint, including the reasonable inferences that may be drawn from those allegations.").

But instead of assuming the truth of the allegations here, the circuit court found (in language the majority cites, slip op. at 9) when it denied the request for a TRO that when the parties executed the Agreement, it was "*clear* . . . that the question of the . . . appropriateness of [OBG's] design of the [plant upgrade] would remain an issue in the [Plant Upgrade Case]." (Emphasis added.)  That assumption (if not a finding) leaped over a dispute of fact

2

that required the court to deny the motion to dismiss.[2]  Indeed, it is just as obvious for present purposes that OBG intended (or at least *could have* intended) the non-disparagement clause to limit the City's future litigation positions, and common-sense reasons support such a reading.  *First*, to permit the City here to use litigation as a sword *and* a shield (offensively as the plaintiff in the Plant Upgrade Case against CDG, and defensively to prevent any recourse by OBG), seems to ignore the $10 million settlement. The City was not merely reacting, but came out swinging when it argued in its opening statement that "most of the problems [at the plant] were design problems created by the design engineer, [OBG]."[3]  In light of the public attention this case garnered in the local press (and the complaint alleges as much), it is not unreasonable to think that an agreement not to disparage could have been intended to include disparaging statements made in court.  *Second*, although the majority may be correct that "[e]vidence about flaws in OBG's design for the plant upgrade and any cause and effect between flaws in the design and the plant upgrade failure was indispensable to an informed factual resolution of the City's contract claim against CDG," the truth of that premise either depends on the resolution of facts disputed by these parties or resort to

---

[2] The court did not exactly go *outside* the complaint, which would have had the effect of converting the motion to dismiss to one for summary judgment.  *See  D'Aoust v. Diamond*, 424 Md. 549, 574 (2012) (noting that where "the trial judge clearly looked outside the 'four corners of the complaint' in reviewing Respondents' Motion to Dismiss, [he] thereby convert[ed] it into a Motion for Summary Judgment).  Instead, the court assumed an answer—the opponent's answer—to the disputed question.

[3] Although OBG claims that the disparaging statements were "publicly reported" in an Eastern Shore newspaper, the article included in the Record Extract does not identify OBG by name.

materials out of bounds for a motion to dismiss. *And finally*, the City cannot prevail on a motion to dismiss even if I were to agree that the non-disparagement clause obviously covered the Plant Upgrade Case without saying so because OBG's complaint alleges otherwise.

The circuit court erred, in my view, when it skipped over the threshold question of whether the parties actually *intended* to include litigation within the scope of the non-disparagement clause in the Agreement. And beyond the mere procedural error, resolution of this question would have framed OBG's breach of contract claims more precisely. If the court or a jury were to find that the parties did *not* intend the non-disparagement claims to encompass the parties' positions in the Plant Upgrade Case, that would end the case, since the City could not have breached the Agreement in that manner. But if the court or a jury were to make the opposite finding, the court would assess the City's privilege claim (and whether the Agreement waived it) against the backdrop of that finding. For the reasons I explain next, that context matters.

### 2. These parties could have waived the litigation privilege.

If the litigation privilege were to apply at all, I take a different view of how it applies, beginning with its scope. The majority refers frequently to the privilege as "absolute," and I agree that the privilege applies absolutely to the in-court statements of a party or witness *when it applies*. I respectfully disagree, though, that the privilege is absolute in the sense that parties cannot waive it.

4

Privileges may, as the litigation privilege and attorney-client privilege both do, serve broader societal purposes. *See, e.g., Mixter v. Farmer*, 215 Md. App. 536, 543 (2013) ("The absolute privilege is broad and comprehensive in order to serve its purpose to foster the 'free and unfettered administration of justice.'" (quoting *Keys v. Chrysler Credit Corp.*, 303 Md. 397, 404 (1985))). But privileges don't exist in a vacuum—they attach to and protect individuals and parties. The litigation privilege protects the whole range of participants in the litigation process, and it applies differently to different players: witnesses, parties, and judges enjoy total immunity from tort liability for statements made in a judicial proceeding, whereas statements by attorneys must bear "some rational relation to the matter at bar." *Norman v. Borison*, 418 Md. 630, 650 (2011). At the most fundamental level, then, the scope of the privilege is a function of context: a witness can defame anyone about anything from the witness stand with malice and impunity, but a lawyer can't do the same from the table or the podium. And so out of the box, "absolute" doesn't really mean *absolute*.

*Next*, parties generally are free to waive privileges, such as the attorney-client, spousal, and other testimonial privileges, just as they can waive claims, defenses, arguments, and objections. They can do so for substantive reasons, tactical reasons, by neglect, or for no reason at all. Like the litigation privilege, these other privileges serve broader societal purposes—the attorney-client privilege, for example, furthers the broader purposes of justice by allowing clients to speak freely with counsel. *See CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 429 Md. 387, 433 (2012). So in this case—where sophisticated parties to a complex

5

infrastructure contract represented by able counsel settled complex litigation through an Agreement that featured an eight-figure payment from OBG to the City—I struggle to understand why, if it wanted to, the City could not agree as part of settling one case to limit the positions it could take in another, *i.e.*, to try the Plant Upgrade Case on the theory that the plant failed because of faulty construction. Again, I don't know and don't opine on whether the parties in fact intended the non-disparagement clause to apply to arguments or testimony in the Plant Upgrade Case. But $10 million from OBG might well justify such an agreement, just as favorable treatment in settlements or plea bargains—or indeed, simply as a trial tactic—might justify a party's decision in another case to waive another privilege. *See, e.g.*, *McCarthy v. United States*, 394 U.S. 459, 466 (1969) ("A defendant who enters [a guilty] plea simultaneously waives several constitutional rights, including his privilege against compulsory self-incrimination. . ."); *United States v. Woodall*, 438 F.2d 1317, 1325 (5th Cir. 1970) ("By offering his own testimony as to a part of the conversation [with his counsel] relative to plea results, [the defendants] waived the right to claim the privilege as to the whole thereof."); *In re Nazarian*,[4] 18 B.R. 143, 147 (Bankr. D. Md. 1982) (holding that the defendants could be held to have waived attorney-client privilege if they raised communications with their attorney in the course of testimony purely for their own benefit).

Moreover, an informed decision on the City's part to try the case in an agreed fashion (in exchange for $10 million) doesn't interfere with the due administration of justice or the

---

[4] No relation.

6

ability of participants to speak freely. The City could readily have decided, on its own, for all sorts of reasons, to focus on faulty construction rather than faulty design. Perhaps, for example, a jury would be more likely to understand a trial theory focused entirely on faulty construction, or a narrower focus might allow the City to avoid presenting witnesses who might perform poorly on the stand or emphasizing documents that undermined its case. CDG would, of course, be free to defend the case however it wished, and the City's strategic and tactical decisions might ultimately have consequences it regrets. But the litigation privilege does not compel parties to present the ideal case, or even their entire potential case—it protects their ability to participate as they wish, consistently with the law, without fear of civil liability, and I think it allows them to agree to forego claims or defenses or positions.

Neither the cases the majority cites nor the principles underlying them elevates the litigation privilege above informed waiver. *First*, our recent decision in *Mixter* presented the analytical inverse of the situation before us. *Mixter*, 215 Md. App. at 541-42. That case stands for two propositions; the one relevant here[5] is that the litigation privilege knocks out *torts* "beyond defamation when those torts arise from the same conduct as the defamation claim." *Id.* at 547 (emphasis added). The linchpin there was the alleged defamation. Allowing other *tort* claims grounded in that same defamatory statement to go forward simply because they had other titles would, as the majority notes correctly, have elevated form over substance in a manner inconsistent with the privilege. *See* slip op. at 32. But here, OBG is

---

[5] The other proposition is that letters prepared and sent for the purpose of preparing for litigation are protected by the privilege in the same way as in-court statements. *Id.* at 544.

7

seeking to enforce a *contract* altogether separate from the Plant Upgrade Case, and specifically its contractual right not to be disparaged (the scope of which, again, is disputed). To apply the *Mixter* principle to these facts would require us to hold that the enforceable scope of the non-disparagement clause depends in the first place on whether a tort claim (that is not alleged) might be barred by the litigation privilege. This seems backwards. And neither *Mixter* nor any other case I have found independently limits a party's right to agree not to disparage, not to take litigation positions, or to waive privileges.

*Second*, the out-of-state cases the majority cites don't account for the important competing interest—previously recognized by this Court—in encouraging settlement and bringing litigation to finality. The majority looks to a case cited by the City, *Rain v. Rolls-Royce Corp.*, 626 F.3d 372 (7th Cir. 2010), in which the United States Court of Appeals for the Seventh Circuit held that the absolute litigation privilege protected an aircraft engine manufacturer for two purported breaches of a non-disparagement agreement it had executed with a seller of engine parts in settling a prior suit. The non-disparagement provision was nothing like the one at issue here: it said simply that "None of the Parties will disparage the others." *Id.* at 375. When the manufacturer made allegations in another complaint that disparaged the seller, it sued and asserted that the manufacturer had breached the non-disparagement agreement. The manufacturer moved for summary judgment, arguing that the absolute litigation privilege applied to bar the suit under the law of Indiana. The trial court granted summary judgment in favor of the manufacturer and the seller appealed. *Id.* at 376.

8

The Seventh Circuit held that Indiana observed an absolute privilege protecting all "relevant statements made in the course of a judicial proceeding," in order to preserve the "due administration of justice by providing actors in judicial proceedings with the freedom to participate without fear of future defamation claims." *Id.* at 376 (quoting *Hartman v. Keri*, 883 N.E.2d 774, 777 (Ind. 2008)); *see also Kelly v. Golden*, 352 F.3d 344, 350 (8th Cir. 2004) (noting that Missouri provided an absolute litigation privilege covering statements made in judicial proceedings, again relying on "the policy favoring freedom of expression and the desire not to inhibit parties from detailing and advocating their claims in court.") In the *Rain* court's view, Indiana favored a "liberal rule" that shrouded with the privilege all statements but "those allegations that are 'so palpably irrelevant to the subject matter of the controversy that no reasonable man can doubt [their] irrelevancy and impropriety.'" *Rain*, 626 F.3d at 377 (quoting *Miller v. Reinert*, 839 N.E.2d 731, 735 (Ind. Ct. App. 2005) (brackets in original)). Notably, however, the court determined that the appellants had *waived the argument* that Indiana's policy favoring the enforcement of contracts outweighed the importance of the litigation privilege by failing to raise it in the district court. *Id.* at 378. (And importantly for our purposes, there was more than one issue waived at the district court level—the appellants also waived the argument that Rolls-Royce had waived the absolute privilege by agreeing to the non-disparagement clause. *Id.*) The court also viewed the contract claim effectively as one sounding in tort—*i.e.*, a defamation claim—and determined

9

only in that context that the privilege barred liability based on a violation of the agreement. *Id.*

Whether because it viewed the policy argument as being waived or for other reasons, *Rain* overlooked the important countervailing principle that parties are free, and should be encouraged, to settle lawsuits by agreement rather than resorting to litigation. *See Smelkinson SYSCO v. Harrell*, 162 Md. App. 437 (2005) (discussed below). For that reason, I find more persuasive the California Court of Appeals's analysis in *Wentland v. Wass*, 126 Cal. App. 4th 1484 (Cal. Ct. App. 2005). In that case, the parties settled a dispute involving Mr. Wentland's management of a local property development company, Parkview Terrace, in which Messrs. Reiss and Wass were partners. *Id.* at 1487-88. The settlement provided that Mr. Reiss would not make any statements that "may have the effect of impugning [Mr. Wentland's] honesty or integrity," and further provided that Mr. Reiss would sign a letter of apology. *Id.* at 1489. As part of a later lawsuit by Messrs. Reiss and Wass against certain partnerships managed by Mr. Wentland, the latter moved for summary judgment. *Id.* at 1487. Messrs. Wass and Reiss opposed the motion by producing an accountant's declaration, along with their own affidavits, that according to Mr. Wentland, contained information that violated their prior non-disparagement agreement. The trial court dismissed Mr. Wentland's cross-complaint, reasoning in part that his breach of contract claim was barred by the litigation privilege, which is codified in California as Cal. Civ. Code § 47(b). *Id.* at 1487-88. The court began by explaining the circumstances under which the privilege applies:

10

> Section 47(b) provides in part that a privileged communication is one made in a judicial proceeding. "The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action."

*Id.* at 1490 (quoting *Silberg v. Anderson,* 786 P.2d 365 (Cal. 1990) (citations omitted)).

After looking at prior cases, the court held that the privilege applied absolutely with regard to tort claims, but that no court had precluded any and all breach of contract claims based on the privilege, and that "whether the litigation privilege applies to an action for breach of contract turns on whether its application furthers the policies underlying the privilege." *Id.* at 1492 (citations omitted). The court concluded that no one can use the litigation privilege to shield himself from *all* liability, and that one can validly contract to waive the litigation privilege. *Id.* at 1494. And in that case, the court determined that the policies behind the privilege were "not furthered by its application in this case":

> This cause of action is not based on allegedly wrongful conduct during litigation. . . Rather, it is based on a breach of a *separate promise independent of the litigation*. . . . This breach was not simply a communication, but also wrongful conduct or performance under the contract, . . . [and] here application of the privilege would frustrate the purpose of the Parkview Terrace agreement.

*Id.* at 1494 (emphasis added). The court saw no reason to allow the party who had, on the one hand, voluntarily agreed to keep silent to use the litigation privilege later to circumvent, on the other hand, the non-disparagement clause and the party's prior agreement:

11

> Application of the litigation privilege in this case does not encourage finality and avoid litigation. In reaching settlement in the Parkview Terrace matter, the parties presumably came to an acceptable conclusion about the truth of Reiss's comments about Wentland's management of the partnership. Allowing such comments to be made in litigation, shielded by the privilege, invites further litigation as to their accuracy and undermines the settlement reached in the Parkview Terrace matter.

*Id.*

The privilege here arises, if at all, in the context of a litigation settlement agreement that conferred rights and imposed obligations on both sides (including, again, a $10 million payment from OBG to the City). We explained in *Smelkinson* that non-disparagement clauses in settlements are valuable and enforceable:

> What SYSCO bought through the negotiated settlement . . . was immediate and long-term "peace" with Harrell, with the attendant right to expect that it would no longer have to expend money, effort, or goodwill in responding to his disparaging allegations. The language [in the contract] and the circumstances surrounding the execution of the Settlement Agreement leave no doubt that SYSCO and Harrell struck a bargain that was designed to prevent precisely what happened here—that SYSCO would pay Harrell $185,000 to drop all his allegations, claims and agitations against the company, only to have Harrell later resume them.

*Smelkinson*, 162 Md. App. at 453. And as we permitted SYSCO to recover damages against Mr. Harrell based on his breach of a non-disparagement clause, we also pointed out Maryland courts' long-standing reluctance to nullify a "negotiated remedy at the heart of a settlement agreement," *id.*:

12

> "The law always favors compromises and amicable adjustments of disputes, rather than compel parties to resort to litigation and it would be strange if, in the absence of clear evidence of fraud or mistake, the parties were not bound and concluded after what has taken place in respect to this award."

*Id.* (quoting *Sisson v. Baltimore*, 51 Md. 83, 95-96 (1879)).

The ultimate question, then, is whether the City agreed, as part of settling its differences with OBG, not to disparage OBG in the Plant Upgrade Case. The outcome of that question depends in the first instance on what the parties intended the non-disparagement clause to cover. The circuit court erred in dismissing the case in the face of that looming factual dispute, and I would reverse and remand on that basis. From there, I would hold that the City could well have agreed to limit its litigation positions in the ongoing litigation, whether viewed as a positional or tactical decision or as a waiver of the litigation privilege, and direct the circuit court on remand to address OBG's claims against that backdrop. And for those reasons, I respectfully dissent.